UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cr. No. 05-10085-RCL |
| ) | |
| HANA F. AL JADER ) | |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Hana F. Al Jader ("the defendant"), by and through undersigned counsel, submits this memorandum of law in support of her motion to suppress evidence. Specifically, the defendant moves this Honorable Court to enter an order suppressing evidence seized from her home by government agents in violation of her rights under the Fourth Amendment to the United States Constitution. The defendant avers that on November 16, 2004, government agents illegally entered her homes after obtaining a search warrant lacking in probable cause.

The defendant contends that the government based its search warrant application upon statements from unknown sources, unnamed sources with no evidence of veracity, and upon stale information. Absent probable cause to search the defendant's homes, the court must order the suppression of all the items illegally obtained from the premises as well as any derivative evidence obtained as the fruit of the poisonous tree.

### FACTS AND BACKGROUND

On November 16, 2004, Federal Bureau of Investigation ("FBI") Special Agent Christa J. Snyder ("Snyder") submitted an application for a warrant to search the

premises of 339 Mystic Street in Arlington, Massachusetts and 62 Cambridge Street in Winchester, Massachusetts.  The defendant resided at 62 Cambridge Street in Winchester and her family owned the property located at 339 Mystic Street in Arlington.  In her application, Snyder informed the court that she had probable cause to believe that, inside the Arlington and Winchester homes, she would find the persons of Tinamarina Amirudin ("Amirudin"), Indah Utom ("Utom") and Legi Yanti Karto ("Karto") as well as passports and immigration documents demonstrating the defendant's connection to the crime of slavery.  See 18 U.S.C. § 1592(a)(3).  Snyder's affidavit in support of the search warrant listed several reasons why she believed she had probable cause.

Snyder claimed in her affidavit that on or about December 9, 2003, a Filipino national named Veronica Pedroza ("Pedroza") contacted the Coalition to Abolish Slavery and Trafficking ("CAST") in Los Angeles, California.  The affidavit stated that Pedroza supposedly told CAST that the defendant unlawfully imprisoned her and other women at 339 Mystic Street in Arlington, Massachusetts.  Pedroza allegedly told CAST that the defendant confiscated the women's passports and immigration documents and forced them to work for her.  After reviewing unspecified immigration records and speaking with unidentified witnesses, Snyder determined that the defendant illegally harbored four additional female aliens at 339 Mystic Street in Arlington and enslaved three other women at her home at 62 Cambridge Street in Winchester.  Snyder further determined that the three women supposedly enslaved at the Winchester address were Utom, Amirudin, and Karto.  Utom, Amirudin, and Karto are all Indonesian nationals.  The unnamed witnesses supposedly revealed that the defendant forced the women at both addresses to perform labor services for her.

Snyder averred that, in February of 2004, she personally interviewed Pedroza. The affidavit maintains that Pedroza told Snyder that in February of 2000, the defendant brought Pedroza and three Indonesian women to the United States. Pedroza recalled that one of the Indonesian women was named Tina and the other Indonesian woman was named Indah. Pedroza stated that she and the three Indonesian women accompanied the defendant to the United States from Saudi Arabia.

Pedroza explained that the defendant is the wife of Prince Mohammad Al-Saud of Saudi Arabia. Pedroza told the FBI that when she arrived in the United States, she worked as a domestic laborer caring for Saudi Prince Al-Saud, who is disabled. Pedroza said that she also cooked, cleaned, and tended to the defendant's needs. The defendant allegedly mandated twenty-four hour a day availability for Pedroza and the three Indonesian women. Pedroza said that the defendant promised to pay her $500.00 per month prior to leaving Saudi Arabia. Once in the United States, however, the defendant allegedly paid Pedroza a total of $200.00 after five months. When Pedroza complained about the money, the defendant purportedly yelled at her.

Pedroza told the FBI that when she and the three Indonesian women arrived in the United States, the defendant confiscated their passports and immigration papers. Pedroza claimed that the defendant placed their immigration documents and passports in a locked metal cabinet located in the defendant's bedroom. According to Pedroza, the defendant maintained her bedroom in the basement of 339 Mystic Street in Arlington. Pedroza maintained that the defendant did not allow the women to leave the house and that they could not use the telephone without the defendant's permission. Moreover, according to Pedroza, the defendant dialed the number when the women wanted to place a call.

3

The defendant supposedly told Pedroza that if she ever attempted to flee her confines, the police would arrest Pedroza because she lacked proper identification. Pedroza relayed that approximately three to six weeks after her arrival in the United States, however, she did flee the defendant's home and took refuge with a Filipino woman "whose name she got out of the telephone book." (Affidavit at 4).

Snyder's affidavit detailed that agents from the FBI and Immigration and Customs Enforcement ("ICE") gleaned additional information from a review of unnamed records and "observations." The affidavit relayed that the defendant owned a home at 339 Mystic Street in Arlington and a second home one-half mile from the Arlington residence at 62 Cambridge Street in Winchester. The affidavit further stated that on January 31, 2000, the United States government issued temporary visitor visas to Pedroza, Amirudin, Utom, and Karto. The government issued the visas to the four women in Riyadh, Saudi Arabia.

According to Snyder's affidavit, record checks revealed that Pedroza, Amirudin, Utom, and Karto entered the United States through New York, New York on February 4, 2000. Supposedly, the government "legally" admitted the four women to the United States on May 3, 2000. Records allegedly reflected a destination of 339 Mystic Street in Arlington, Massachusetts. Records also revealed that an Indonesian national named Morniati Kadir came to the United States pursuant to a business visa on February 20, 2001 and listed her destination as 339 Mystic Street in Arlington. The affidavit further claimed that a records check revealed that as late as November 10, 2004, Amirudin, Utom, Karto, and Kadir had not left the United States.

4

After detailing the information gleaned from records and observations, Snyder's affidavit discusses information learned from interviews with neighbors of 339 Mystic Street in Arlington and 62 Cambridge Street in Winchester. The neighbors supposedly told the FBI that the defendant moved from her Arlington Street address to her Winchester home. One of the neighbors of the Arlington Street residence explained that the defendant always keeps three to four Indonesian women at all times in her home and that some of these maids change every six months. The same neighbor supposedly observed that the maids never left the Arlington street home without accompaniment. A neighbor of the Winchester residence stated that, during August of 2004, she observed four females in their 20's waiting for a bus near the defendant's Winchester home. The affidavit also reports that on October 21, 2004, a neighbor of the Winchester home also observed three females waiting for a bus. Finally, the affidavit reports that on October 22, 2004, a neighbor of the residence at 62 Cambridge Street in Arlington observed a non-Middle Eastern woman with light brown skin cooking on a gas grill. The affidavit does not name or provide any information about the neighbors.

Following the submission of her affidavit, the district court[1] granted Snyder's request for a search warrant. The government executed the search warrant on the defendants' homes. Within the Winchester home, the government discovered two Indonesian women who supposedly worked as maids for the defendant. The women were Rohimah Bakri ("Bakri") and Trimurniyati Dzalipa ("Dzalipa"). The government also recovered, *inter alia*, passports and immigration documents for Bakri and Dzalipa. The two Indonesian women discovered in the defendant's home were not referenced in

---

[1] The Honorable Joyce London Alexander, United States Magistrate Judge for the District of Massachusetts.

5

the search warrant application. The government's search did not yield the presence of Amirudin, Utom, Karto, or Kadir who the government told the district court it expected to find in the defendant's homes.

## **ARGUMENT**

Snyder's application lacked the probable cause necessary to procure a search warrant. Probability is the touchstone of the probable cause analysis. United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997). Probable cause exists when the four corners of the affidavit in support of the application for a search warrant "demonstrate in some trustworthy fashion the likelihood that an offense has been committed." United States v. Vigeant, 176 F.3d 565, 569 (1st Cir. 1999) (internal punctuation, citations and quotations omitted). "Mere suspicion, rumor, or strong reason to suspect wrongdoing are not sufficient." Id. (internal citations and quotations omitted).

If the affidavit bases probable cause largely upon information supplied by a tipster or informant, then the government must supply the reviewing court with some basis for assessing the informant's veracity, reliability, and source of knowledge. Khounsavanh, 113 F.3d at 284. Factors that a reviewing court may consider in determining an informant's veracity include the "basis of knowledge of the person supplying hearsay information; whether informant statements are self-authenticating, whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable (e.g., through police surveillance); [and] whether a law-enforcement affiant included a professional assessment of the probable significance of the facts related by the informant, based on experience or expertise." Id. "The risk that the informant is lying or in error need not be wholly eliminated. Rather, what is needed is that the probability of a lying or

6

inaccurate informer has been sufficiently reduced by corroborative facts and observations." Id. (internal quotations and citations omitted).

In assessing an informant's reliability, the First Circuit recently held that "face to face contact between the informant and the agent, the specific and self-incriminating nature of the tip, and the respectable amount of corroboration" will provide a magistrate with a substantial basis to conclude that a search will yield evidence of criminal activity in the place named in the affidavit. United States v. Greenburg, 410 F.3d 63, 69 (1st Cir. 2005). The First Circuit, however, cautioned that "a probable cause finding may be based on an informant's tip so long as the probability of a lying or inaccurate informer has been sufficiently reduced." Id.

The United States Supreme Court has held that courts must assess an informant's veracity, reliability, and basis of knowledge in accordance with the totality of the circumstances found within a particular case. Illinois v. Gates, 462 U.S. 213, 233-34 (1983). The totality of the circumstances test permits a reviewing court to find probable cause if a strong showing in one area compensates for a weakness in another area. Id. For example, the Court mentioned that if an unquestionably honest citizen comes forward with a report of criminal activity, the fact that fabrication of the report would subject this honest citizen to criminal prosecution demonstrates his veracity. Id. Hence, rigorous scrutiny of his basis of knowledge is unnecessary. Id.; Adams v. Williams, 407 U.S. 143, 146-47 (1972). Despite the greater flexibility accorded by the totality of the circumstances test, courts cannot find probable cause where the government presents an uncorroborated affidavit that fails to reveal the source of its information. See United States v. Truong, 921 F. Supp. 39, 42 (D. Mass. 1996).

7

Here, the government presents an affidavit riddled with uncorroborated information supplied by unknown and unidentified sources. The hallmark of the government's affidavit is that probable cause supposedly exists to find Amirudin, Utom, and Karto located in the defendant's Arlington or Winchester homes. The affidavit, however, never reveals how the government learned the identities of the three Indonesian women. The affidavit simply bases its conclusions upon unspecified records and interviews with witnesses. The affidavit never reveals the identity of the witnesses and contains no statement regarding their veracity or basis of knowledge.

The affidavit did contain some information from Pedroza who mentioned that in 2000 she traveled from Saudi Arabia to the United States with Indonesian women named Tina and Indah. Pedroza spoke with the FBI in 2004. Pedroza also detailed her personal situation that occurred four years prior to the interview with the FBI. She described how she and the Indonesian women performed services for the defendant and how the defendant kept their passports in a locked box in the basement bedroom at 339 Mystic Street in Arlington.

The four year old information Pedroza supplied was stale. In every warrant application, probable cause exists only if the event described in the affidavit is close enough in time to allow a reviewing court to conclude that a likelihood of criminal activity still exists in the place delineated in the search warrant application. See Sgro v. United States, 287 U.S. 206, 210 (1932) ("it is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable

cause at that time") (Hughes, C.J.); Vigeant, 176 F.3d at 570 (holding that absence of independent corroboration coupled with temporal gap of "six months of before the allegedly suspicious financial transaction" constituted an incurable staleness hurdle); United States v Charest, 602 F.2d 1015, 1018 (1st Cir. 1979) (sixteen day lag between a murder and the issuance of a search warrant rendered probable cause to search for a murder weapon stale).

Here, the government failed to corroborate Pedroza's outdated information with any authentication from sources that could demonstrate reliability or a basis of knowledge. After interviewing Pedroza, the government supposedly gathered corroborative evidence from "records" and "observations." The government supposedly learned through its review of the records and observations that Amirudin, Utom, and Karto traveled to the United States from Saudi Arabia in 2000 and listed 339 Mystic Street in Arlington as their destination. Records and observations further revealed that the three women had not left the United States. The affidavit failed to specify the records or observations relied upon by the government in ascertaining this information.

The affidavit did mention the observations of "neighbors" of the Arlington and Winchester properties. These unknown and unspecified neighbors told the government that on two separate occasions, they observed multiple unknown females waiting for a bus near the Winchester house. One of these neighbors told the government that the women were "in their 20's." (Affidavit at 6). Another neighbor then told the government that he had observed a light brown skinned non-Middle Eastern female cooking on a gas grill outside the property of 62 Cambridge Street in Arlington. In addition, the government claims it learned that the defendant moved from the Arlington

9

home to the Winchester home. Speaking with an unidentified neighbor of the Arlington property, the government learned that the defendant kept three to four Indonesian maids with her at all times in her home and that some these maids changed approximately every six months. Based upon this information, the government concluded that it had probable cause to search the defendant's Arlington and Winchester homes. The government is mistaken.

The government's affidavit fails to contain any information necessary to assess the veracity of its sources. The affidavit lists only unnamed neighbors of the Arlington and Winchester properties. It contains no information about these supposed neighbors for a court to assess honesty or trustworthiness. Unlike the situation in Greenburg where an informant provides a self-incriminating tip to the authorities or the situation described in Gates where an unquestionably honest citizen provides a tip to the police, the affidavit reveals nothing about these so-called neighbors. The affidavit does not indicate who they are. It does not indicate where they live. It does not discuss the context of how they came to make these supposed observations. In fact, the affidavit does not indicate that the government even knew the neighbors' names or identities. Absent some indicia of reliability, the government faces an insurmountable hurdle when attempting to establish probable cause.

The information supplied by these unknown neighbors is hardly self-authenticating enough to topple the government's veracity hurdle. One of the neighbors observed that she saw the defendant with three to four Indonesian maids at the Arlington property. The government's own affidavit, however, reflects that the FBI agents learned that the defendant moved out of the Arlington property to the Winchester property. A Winchester

10

neighbor told the government that on two separate occasions, she observed three to four women waiting for a bus near the Winchester property. This information falls far short of providing sufficient details for a finder of fact to conclude that probable cause exits to search the Winchester property for evidence of a slavery trafficking crime involving three specifically identified Indonesian women.

The government's affidavit indicated that probable cause existed to believe that it would find Amirudin, Utom, Karto, and Kadir inside the defendant's homes. The neighbors provided no observations consistent with the fact that these three women lived at the defendants' residence. In fact, the sole descriptive element contained in the affidavit is that the women observed were in their 20's. The government, however, knew that the three Indonesian women it sought were in their 30's.

The mere fact an unidentified and unknown neighbor spied three to four women waiting for a bus outside the Winchester residence hardly amounts to corroborative proof that the defendant harbored three particular Indonesian women. Moreover, the inclusion of a neighbor observation that he spied a woman cooking on a gas grill outside "62 Cambridge Street in Arlington" does nothing to establish probable cause. The fact that the neighbor observed that woman had brown skin but did not appear to be Middle Eastern is at best illusory. The affidavit contains no information that the neighbor has the knowledge or ability discern a Middle Eastern origin. Moreover, the presence of a brown skinned woman cooking on a grill hardly reveals that any of the three sought-after Indonesian women were in the house. The affidavit contains no physical description of any of the named Indonesian women. Furthermore, the affidavit is inconsistent with the facts. The affidavit reflects that the neighbor spotted a woman cooking on a gas grill

11

outside the property located at "62 Cambridge Street in Arlington." As the affidavit clearly states in prior and subsequent paragraphs, however, the defendant's address at 62 Cambridge Street is located in Winchester not Arlington.

Rather than establish probable cause to conclude the government would find the three named Indonesian women in the defendants' homes, the government's own affidavit actually undermines the probable cause conclusion. Specifically, one of the unknown neighbors relied upon by the government told the FBI that three to four maids resided in the Arlington home and that some of the maids changed approximately every six months. (Affidavit at 5). Armed with this information, the government could hardly conclude that it would find the same three Indonesian women it sought inside either home.

In fact, the government did <u>not</u> find Amirudin, Utom, Karto, or Kadir within either home. The government did find Bakri and Dzalipa and their passports and immigration documents. The government seized these documents after determining that Bakri and Dzalipa were Indonesian maids. Not only does the failure to find Amirudin, Utom, Karto, or Kadir demonstrate a complete absence of self-authentication, the subsequent seizure of Bakri's and Dzalipa's documents was improper. The government's affidavit never mentioned the existence of Bakri or Dzalipa. The government did not enter the residences seeking Bakri or Dzalipa. Rather, it sought the presence of Amirudin, Utom, Karto, or Kadir. Accordingly, the government lacked probable cause to believe that Bakri or Dzalipa were the product of criminal activity, and it had no right to search and seize their passports and immigration documents.[2]

---

[2] Although the defendant provided the agents with the key to search the contents of her safe, her consent under the circumstances was involuntary. As referenced in footnote two of the defendant's accompanying Memorandum of Law in Support of her Motion to Suppress Statements, the defendant was a foreign national who hailed from a decidedly non-democratic regime with a legal system premised upon the Code

12

The government knew the identities of Amirudin, Utom, Karto, or Kadir based upon "records." Prior to seeking a search warrant, the government should have sought specific corroborative facts aimed at ascertaining whether the sought-after women were indeed inside the defendants' homes. Corroborative facts are the method of reducing the probability of a lying or inaccurate informer. Khounsavanh, 113 F.3d at 284. Typically, the government verifies details from an unknown informant by conducting personal surveillance. In drug cases, the government typically conducts a controlled transaction. See United States v. Genao, 281 F.3d 305, 309 (1st Cir. 2002) ("The controlled buy did, however, yield a recovery of heroin consistent with the informant's original tip"); Khounsavanh, 113 F.3d at 286 (controlled buy "reduced the chances of a reckless or prevaricating tale") (internal quotations and citations omitted).

While a controlled transaction would not apply in this situation, the government could have engaged in personal surveillance of the scene to verify the accuracy of these "neighbors." Here, the government failed to conduct any type of surveillance before requesting a search warrant. Instead, the government merely relied upon four year old information buttressed by unidentified "records" and observations from unknown informants described only as "neighbors." The government's failure to authenticate or corroborate the informants' allegations renders its affidavit fatally defective and lacking in probable cause. Moreover, the fact that the government did not find the three sought after Indonesian women further amplifies the abject absence of probable cause. A searched based upon affidavit lacking in probable cause violates the defendant's

---

of Hammurabi. In addition, English is not the defendant's native language. Given the differences in culture, legal systems, and language as well as the presence of twenty armed federal agents, the defendant's decision to provide the agents with the key to her safe was hardly voluntary. Regardless, a finding of a lack of probable cause will render the entire search illegal as fruits of the poisonous tree.

constitutional rights. Accordingly, the court must order the suppression of the items seized pursuant to the illegal search warrant.

## **CONCLUSION**

For the foregoing reasons, this court must order the suppression of the items seized in violation of the defendant's rights accorded to her by the Fourth Amendment to the United States Constitution.

Dated: November 14, 2005

                              Respectfully submitted,
                              HANA AL JADER
                              By her attorneys,

                              /s/ Brad Bailey
                              _____
                              Brad Bailey, BBO #549749
                              Gary G. Pelletier, BBO#631732
                              DENNER O'MALLEY, LLP
                              Four Longfellow Place, 35th Floor
                              Boston, MA 02114
                              (617) 227-2800