UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cr. No. 05-10085-RCL |
| ) | |
| HANA F. AL JADER ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

Hana F. Al Jader ("the defendant"), by and through undersigned counsel, submits this memorandum of law in support of her motion to suppress statements. Specifically, the defendant moves this Honorable Court to enter an order suppressing her custodial statements made to law enforcement officials taken in violation of her rights under the Fifth Amendment to the United States Constitution. The defendant avers that on November 16, 2004, government agents illegally questioned her without first informing her that she had the right to remain silent and to speak with an attorney. Absent the government's imparting of the procedural safeguards accorded by the Fifth Amendment, the court must order the suppression of all the statements wrongfully elicited from the defendant as well as any derivative evidence obtained as the fruit of the poisonous tree.

**FACTS AND BACKGROUND**

On November 16, 2004, twenty agents of Federal Bureau of Investigation ("FBI") and Customs and Immigration Enforcement ("ICE") raided the defendant's homes after

obtaining a search warrant from the district court.[1] Special Agent Christa J. Snyder ("Snyder") submitted an application for a warrant to search the premises of 339 Mystic Street in Arlington, Massachusetts and 62 Cambridge Street in Winchester, Massachusetts. The defendant resided at 62 Cambridge Street in Winchester and her family owned the property located at 339 Mystic Street in Arlington. The defendant is the wife of Prince Mohammed Al-Saud of the Saudi Arabian Royal Family. Prince Al-Saud is disabled.

In her application for a search warrant, Snyder informed the court that she had probable cause to believe that, inside the Arlington and Winchester homes, she would find the persons of Tinamarina Amirudin ("Amirudin"), Indah Utom ("Utom") and Legi Yanti Karto ("Karto") as well as passports and immigration documents demonstrating the defendant's connection to the crime of slavery. See 18 U.S.C. § 1592(a)(3). When the agents executed the search warrant, they discovered two Indonesian women who supposedly worked as maids for the defendant within the Winchester home. The women were Rohimah Bakri ("Bakri") and Trimurniyati Dzalipa ("Dzalipa"). The government also recovered, *inter alia*, passports and immigration documents for Bakri and Dzalipa.

In executing the search warrant, the agents ordered the occupants of the Winchester home to remain in the living room while the agents conducted their search of the premises. (FBI Report prepared by Special Agents Christa L. Corr and Peter A. Erickson ("Erickson Report") at 1). The agents allowed Prince Al-Saud to remain on his bed on the second floor landing due to his disability. (Id.) The agents entered the defendant's

---

[1] The Honorable Joyce London Alexander, United States Magistrate Judge for the District of Massachusetts.

2

home with their guns drawn and many of the agents wore bullet proof vests with ammunition belts.

During the course of the raid, FBI agents conducted an extensive interview with the defendant. The agents questioned the defendant about a variety of topics ranging from her marriage to Prince Al-Saud to her utilization of Indonesian maids. (See FBI Report of Hana Al-Jader Interview "Defendant Interview"). Prior to conducting this interview, the agents never informed the defendant that she was free to leave. Prior to conducting the interview, the agents never asked the defendant whether she wished to answer their questions. Prior to conducting the interview, the agents never informed the defendant of her rights in accordance with the procedures outlined in Miranda v. Arizona, 384 U.S. 436 (1966).

The defendant told the agents during the interview that she initially moved to the Boston area in 1994 so that her disabled husband could receive treatment at the Spaulding Rehabilitation Hospital. The defendant stated that the Saudi Royal Family typically provides her with approximately $300,000.00 per year to cover the needs of her family. The defendant also told the agents that she employed two Indonesian maids that she hired in Saudi Arabia. The two maids were Bakri and Dzalipa.

The defendant told the agents that in Saudi Arabia, she paid the two maids $200.00 to $300.00 per month. When the two women came to work for her in the United States, the defendant maintained that she paid them $1500.00 per month. The defendant stated that she often had the women's salaries sent directly to their families through the defendant's sister in Saudi Arabia. The defendant informed the agents that she vested power of

3

attorney in her sister who resides in Saudi Arabia. She also claimed that she wired money to the women's families in Indonesia via Western Union.

The defendant further admitted that, in or around 2001, she had three Indonesian maids who lived with her at 339 Mystic Street in Arlington. The defendant confessed that the three Indonesian maids ran away from her Arlington Street home. The defendant further relayed that she had hired a Palestinian woman named Mukarram Louck ("Louck") to supervise the maids. Louck's additional duties included caring for the defendant's children and cleaning the house. The defendant told the agents that Louck was responsible for the three Indonesian maids who fled her house.

Finally, the defendant told the agents that she kept her maids' passports and immigration documents inside a locked safe. The defendant provided Snyder with the key to the safe. Upon opening the safe, the government recovered the passports and immigration documents for Bakri and Dzalipa. Approximately five hours after entering the defendant's home, the agents concluded the search and allowed the defendant to tend to her husband who had remained upstairs. Based upon the information recovered during the search and upon the defendant's own statements, the government obtained an indictment charging the defendant with the crimes of slavery trafficking, 18 U.S.C. § 1592(a)(3), and harboring illegal aliens. See 8 U.S.C. § 1324.

## ARGUMENT

The government violated the defendant's Fifth Amendment rights when it engaged in custodial questioning without first giving the defendant her Miranda warnings. It is axiomatic that government agents and the police must provide a suspect with Miranda warnings before initiating a custodial interrogation. Dickerson v. United States, 530

U.S. 428, 432 (2000). "These warnings (which have come to be known colloquially as "*Miranda* rights") are: a suspect has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Dickerson, 530 U.S. at 435 (internal quotations omitted).

In this case, the government unquestionably failed to adhere to a basic prophylactic rule in effect since 1966. The government's failure to provide Miranda warnings prior to a custodial interrogation is a Fifth Amendment violation. Id. at 439. Accordingly, the sole question that this court must address is whether the defendant was in custody at the time she made the statements. In accordance with well-established jurisprudence, the court must answer this question in the affirmative.

In evaluating whether a suspect is in custody for Miranda purposes, the relevant inquiry is whether there is a formal arrest or a significant restraint on the suspect's freedom of movement rendering the government's actions akin to a formal arrest. California v. Beheler, 463 U.S. 1121, 1125 (1983). The First Circuit has instructed the district courts to consider several factors when determining whether a significant deprivation or restraint on the suspect's freedom of movement exits. See United States v. Lanni, 951 F.2d 440, 442 (1st Cir. 1991). These factors include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Id. (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987) (internal quotations omitted). Moreover, the mere fact that questioning occurs within a suspect's home does not necessarily render the interrogation

non-custodial.  See United States v. Griffin, 922 F.2d 1343, 1355 n. 15 (8th Cir.1990) ("It is the accepted logic that an interrogation in familiar surroundings such as one's own home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody.  Nonetheless, it is not difficult to envision that a suspect's sense of captivity can actually be intensified by the intrusive and intimidating environment created when agents of the law take control of a person's private residence.  After all, a person cannot reasonably expect to be free anywhere if not within the refuge of his home") (internal citations omitted).

Applying the First Circuit's Lanni-Masse factors, district courts have found the existence of custody in situations far less intrusive than the one presented here.  For example, in United States v. Bunnell, 106 F.Supp.2d 60, 66-69 (D. Me. 2000), the district court concluded that an interrogation conducted within the suspect's home was custodial where five or six agents appeared at the suspect's home, questioned him for about an hour, and commanded that he remain in his kitchen.  In United States v. Goodridge, 945 F. Supp. 359, 364-367 (D. Mass. 1996), the district court found that an interrogation conducted in a defendant's home was custodial where two agents monitored him at all times and several agents freely entered his home during a search.

In analyzing the salient factors, one district court considered a myriad of reasons why questioning in the home during a search was custodial.  The factors relied upon by the district court included "(i) defendant was not at liberty to move about the house or to leave during the course of the search; (ii) he was separated from his wife, who was sequestered outside under the watch of another agent; (iii) he was required to remain seated at his kitchen table, under the watch and control of one of the agents while others

6

searched; (iv) although defendant was questioned in the familiar surroundings of his home, the presence of numerous armed law enforcement officials created an atmosphere that was at least intimidating and probably coercive; (v) defendant's subjective belief that he was not free to go was objectively reasonable--a reasonable person placed in defendant's position would have believed that he or she was hardly free to leave, and was under the control of law enforcement; and (vi) the questions asked evidenced a calculated effort to interrogate the defendant for the purpose of successfully eliciting unwarned incriminating statements by maintaining a level of custody sufficient to intimidate but insufficient to trigger *Miranda.* The effort failed. This was not a situation in which law enforcement officers routinely enter a suspect's home for an informal discussion relevant to a general investigation, or one in which casual questions related to identity, personal safety, or access to the premises--that is, questions merely incident to a lawful search-- are asked. The agents here had probable cause to believe [the suspect] had committed a crime and that the evidence of the crime would be found in his home." United States v. Bullins, 880 F. Supp. 76, 78-79 (D.N.H. 1995).

Bullins is virtually indistinguishable from the present case. Here, the defendant could not leave or move about her home during the search. The agents separated the defendant from her disabled husband who remained confined to a bed upstairs. The agents corralled the defendant into the downstairs living room while they conducted the search. The agents arrived at the defendant's home to conduct the search at approximately 10:00 a.m. on November 16, 2004. Approximately five hours later, they finished their search and allowed the defendant to tend to her husband's needs. As in Bullins, this was not a situation where the agents merely asked questions relating to identity, safety, or access to

the premises. On the contrary, the agents unmistakably believed that the defendant had committed the crime of trafficking in slavery and that her home would contain specific evidence of that crime. Finally, unlike <u>Bullins</u>, <u>Goodridge</u>, or <u>Bunnell</u> where the district courts found a custodial situation where less than ten agents entered the respective suspects' homes, the instant case reveals that no less than **twenty agents** invaded the defendant's home on November 16, 2004. (Erickson Report at 3-4). Many of the agents drew their guns and wore bullet proof vests with ammunition belts. The presence of **twenty armed agents** combined with the restrictions on the defendant's movement, the nature of the questioning, and the five hour length of the intrusion easily renders this situation custodial. By failing to advise the defendant of her Miranda protections before initiating this custodial interrogation, the government violated the defendant's constitutional rights.[2] The court must remedy this violation by ordering the suppression of the illegally obtained statements.

---

[2] The need for Miranda warnings is particularly acute here given that the defendant is a foreign national who hails from a non-democratic regime that subjugates women and renders them largely without basic human rights. In addition, rather than follow a constitutionally based system like the United States, Saudi Arabia adopts a vastly different Islamic legal system based upon the Hammurabi Code. Given the different legal and cultural systems coupled with the fact that English is not the defendant's native language, the need for effective warnings becomes even more pronounced.

## **CONCLUSION**

For the foregoing reasons, this court must order the suppression of the statements obtained in derogation of the defendant's rights accorded to her by the Fifth Amendment to the United States Constitution.

Dated: November 14, 2005

                                      Respectfully submitted,
                                      HANA AL JADER
                                      By her attorneys,

                                      /s/ `Brad Bailey`
                                      _____
                                      Brad Bailey, BBO #549749
                                      Gary G. Pelletier, BBO#631732
                                      DENNER O'MALLEY, LLP
                                      Four Longfellow Place, 35th Floor
                                      Boston, MA 02114
                                      (617) 227-2800