**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cr. No. 05-10085-RCL |
| ) | |
| HANA F. AL JADER ) | |

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR ACCESS TO GOVERNMENT WITNESSES**

Hana F. Al Jader ("the defendant"), by and through undersigned counsel, submits this supplemental memorandum of law in support of her motion for access to government witnesses. Through this supplemental memorandum, the defendant renews her previously filed motion asking this Honorable Court to enter an order allowing her to contact Rohimah Bakri ("Bakri") and Trimurniyati Dzalipa ("Dzalipa"). Bakri and Dzalipa are Indonesian nationals who previously lived in the defendant's home on 62 Cambridge Street in Winchester, Massachusetts. Following a raid conducted on November 16, 2004, the government removed the two Indonesian women from the defendant's home. The government secreted the women to an undisclosed location and has prevented the defendant (and her attorneys) from contacting the women.

The government has obtained an indictment charging the defendant with the crime of slavery trafficking in violation of 18 U.S.C. § 1592(a)(3) and harboring illegal aliens in violation of 8 U.S.C. § 1324. The two Indonesian women are likely critical witnesses in the government's case against the defendant. The continued denial of access to these potentially vital witnesses constitutes a clear violation of the defendant's due process

rights under the Fifth Amendment to the United States Constitution as well as her rights enshrined in the Constitution's First and Sixth Amendments. Absent an order allowing her to contact these two potential witnesses, the defendant avers that she faces an insurmountable hurdle to her effort to receive a fair trial.

## FACTS AND BACKGROUND

On November 16, 2004, twenty armed agents of Federal Bureau of Investigation ("FBI") and Customs and Immigration Enforcement ("ICE") raided the defendant's homes after obtaining a search warrant from the district court.[1] Special Agent Christa J. Snyder ("Snyder") submitted an application for a warrant to search the premises of 339 Mystic Street in Arlington, Massachusetts and 62 Cambridge Street in Winchester, Massachusetts. The defendant resided at 62 Cambridge Street in Winchester and her family owned the property located at 339 Mystic Street in Arlington. The defendant is the wife of Prince Mohammed Al-Saud of the Saudi Arabian Royal Family. Prince Al-Saud is disabled.

In her application for a search warrant, Snyder informed the court that she had probable cause to believe that, inside the Arlington and Winchester homes, she would find the persons of Tinamarina Amirudin ("Amirudin"), Indah Utom ("Utom") and Legi Yanti Karto ("Karto") as well as passports and immigration documents. When the agents executed the search warrant, they discovered two Indonesian women who supposedly worked as maids for the defendant within the Winchester home. The women were Bakri and Dzalipa. The government also recovered, *inter alia*, passports and immigration documents for Bakri and Dzalipa.

---

[1] The Honorable Joyce London Alexander, United States Magistrate Judge for the District of Massachusetts.

Following the raid, government agents removed Bakri and Dzalipa from the defendant's home. Screaming in fear as the government led the women from the home, the two Indonesian women sobbed and cried aloud for "Mama Hana." (Affidavit of Al Saud at paragraph 18, attached as Exhibit B). Since the removal of the women from the defendant's home, the government has secreted the women to a location unknown to the defendant and her attorneys. (Affidavit of Reem Hejazi at paragraph 13, attached as Exhibit C). The government has maintained custodial control over the women and instructed them not to contact the defendant or her family. (Affidavit of Ali Hijazi at paragraph 11, attached as Exhibit D); Transcript of Status Conference before the Honorable Joyce London Alexander on July 13, 2005 (hereinafter "Tr.") at 10 (Mr. Merritt: "[T]hey were instructed, as all witnesses are, that you should not talk to other witnesses about the case"). Adding to their isolation, the government provided the women with a cellular phone solely to facilitate their communication with the FBI. (See Government Report 03546, attached as Exhibit E).

In addition to Bakri and Dzalipa, the government has also concealed from the defendant and her attorneys several other putative witnesses that may prove critical to the defendant's case. These witnesses include Amirudin, Utom, Karto, Karto Kadir, Murniati Hasan, Morinati Kadir, and Veronica Pedroza.[2] The government's attempts to thwart the defendant's access to these witnesses prompted the defendant, through her prior counsel, to file the instant motion for access to government witnesses. In response to the defendant's motion, the court ordered the government to communicate with the

---

[2] Although the motion for access to government witnesses references only Bakri and Dzalipa, it is unclear whether the defendant has a right of access to any of the other supposed governmental witnesses.

3

witnesses and inform them they had a right to speak with the defense. The court instructed the government to certify the witnesses' responses to the court. On September 2, 2005, the government filed an opposition to the defendant's motion for access to government witnesses. In its opposition brief, the government stated that after speaking with Bakri and Dzalipa, both women indicated that they did not wish to speak with defense counsel. (Government's Opposition Brief at 2). The government did not, however, include a certification as directed by the court.[3]

## ARGUMENT

The government has violated the defendant's First, Fifth, and Sixth Amendment rights by denying the defendant access to its potential witnesses. It is well-established that in criminal proceedings both the prosecution and the defense enjoy an equal right of unfettered access to potential witnesses. Kines v. Butterworth, 669 F.2d 6, 9 (1st Cir. 1981). While both parties have an equal right of access to potential witnesses, the potential witnesses also have a right not to speak with either the prosecution or the defense if they choose. United States v. Arboleda, 929 F.2d 858, 868 (1st Cir. 1991). Agents of the prosecution, however, cannot prompt a witness' decision to refuse to speak with the defense. Id. Although no violation occurs when a potential witness freely elects not to speak with the defense, an improper denial of access occurs if the government action causes the witness' refusal to speak with the defense. Id. The government may interfere with a defendant's right of access only upon a showing of the clearest and most

---

[3] The district court directed the government to certify to the defendant whether the putative witnesses welcomed contact with the defendant or her counsel. Tr. at 7-10. Contrary to the court's order, however, the government's opposition memorandum contains no affidavit or certificate of service attesting to the truth of its assertions that Bakri and Dzalipa do not want contact with defense counsel.

compelling considerations.  United States v. Rodriguez-Berrios, 2005 WL 1414270, at *2 (D.P.R. June 11, 2005).  Moreover, while a court cannot compel a witness to submit to a pretrial interview, due process counsels in favor of permitting access to the witness in order to protect a defendant's fundamental right to a fair trial.  See United States v. Pena, 17 F.Supp.2d 33, 37 (D. Mass. 1998).

Here, governmental action has triggered the witnesses' decision not to speak with the defense counsel.  Specifically, on November 16, 2005, the government removed Bakri and Dzalipa from the defendant's home against the will of the two Indonesian women.  Indeed, during the raid, the two Indonesian women screamed, sobbed and cried aloud imploring the agents not to separate them from "Mama Hana."  (Affidavit of Al Saud at paragraph 18).  The government then hid the two women in an undisclosed location barring contact with their family and friends.  (Hejazi Affidavit at paragraphs 11 and 13).  For one week following the search, the government placed the witnesses in a hotel room adjoining a separate room with a number of federal agents.  (FBI Disclosure 50-BS-93374 at 1, attached as Exhibit F).  By the government's own admission, it instructed the two women not to speak with other witnesses. Tr. at 10.  Despite repeated requests by the women to contact the defendant and return to her home, the government has isolated the women preventing them even from using the telephone.  (Hejazi Affidavit at Paragraphs 11 and 13) ([Dzalipa] appeared to be almost crying and she told me that the police didn't let her use the telephone . . . she missed Mama Hana and [] she wanted to return to her").

The statements to Ali Hijazi clearly reveal that the women did wish to speak with the defendant.  They also reveal that the government imprisoned the women in an isolated

5

environment devoid of unrestricted contact with the outside world.  The environment established by the government was inherently coercive and designed to overbear the will of the two Indonesian women.  Any change in attitude toward the defendant regarding a desire for contact likely is a direct result of the governmental coercion.  (See Psychiatric Forensic Review at 5, attached as Exhibit A).  Brainwashed by their governmental captors, the women adhere to the directives of their new protectors.  (Id.) ("The available data supports the conclusion that there was a significant change in [Dzalipa's] and [Bakri's] expressed sentiment regarding [the defendant] after they had been in protective custody, relative to their expressed sentiment and behavior while living with the defendant.  The magnitude of this change of feeling and attitudes is quite significant.  A psychological explanation for this pre and post protective custody change is the condition known as the Stockholm Syndrome . . . The Stockholm Syndrome is an emotional attachment, a bond of interdependence between captor and captive").  Moreover, these women worked in Saudi Arabia before arriving in the United States.  The government undoubtedly knew that Saudi Arabia is a non-democratic regime known for the social subjugation of women with an Islamic legal system based upon the Code of Hammurabi.  When the government entered the defendant's home with guns drawn, it undoubtedly sparked immense fear in the witnesses.  The government has continued to instill fear in the witnesses by subjecting them to monitored isolation for the past year.  Through its heavy handed actions, the government instigated the witnesses' new decision not to speak with the defendant or her attorneys by overbearing their free will.  In promoting this reaction, the government has violated the defendant's well-established right of access.

The government's violation is particularly egregious in light of the defendant's need to speak with the witnesses in order to receive a fair trial. Specifically, the government has accused the defendant of slavery trafficking and harboring illegal aliens. The witnesses likely can provide exculpatory information material to the defendant's defense. Given the charges in this case, the witnesses are a direct source of information regarding treatment, working conditions, and wages. The witnesses' statements likely will corroborate the defendant's assertions and rebut the government's allegations. Hence, access to the witnesses ensures fundamental fairness and due process for the defense.

The need for witness statements to ensure fundamental fairness favors at least limited access for the defense. See Pena, 17 F.Supp.2d at 37. In Pena, for example, the court weighed the defendant's need for access against the safety concerns of the witnesses. The court concluded that it could ameliorate those safety concerns if the government provided access only to defense counsel or if the government chose to allow defense counsel to meet the witnesses at a neutral location. Id. Although the court in Pena acknowledged that it could not compel the witnesses to speak with the defendant in a criminal case, it could at least allow the defendant an opportunity to arrange an interview. Id.

Here, unlike Pena, no concerns for the witnesses' safety exist. The defendant is a thirty-eight year old woman with no criminal record subject to electronic monitoring as administered through pretrial services. No evidence exists that she poses any kind of danger or threat to the witnesses here. Even if, however, the government could articulate a threat to the witnesses' safety, the court can easily eradicate that threat. As the court did in Pena, the court could compel defense counsel not to share the witnesses' location

and/or physical access with their client, and the court could instruct the government to arrange a meeting at a neutral location. Although the court cannot ensure that the witnesses speak with defense counsel, it can ensure that defense counsel at least have an opportunity to meet with the witnesses. Given the limited intrusion involved and the critical nature of the witnesses' information, the court should craft an order that protects and preserves the defendant's due process rights.

## **CONCLUSION**

For the foregoing reasons, this court must order the government to provide the defendant with access to its witnesses.

Dated: November 14, 2005

                                              Respectfully submitted,
                                              HANA AL JADER
                                              By her attorneys,

                                              /s/ `Brad Bailey`
                                              _____
                                              Brad Bailey, BBO #549749
                                              Gary G. Pelletier, BBO#631732
                                              Laura P. Malouf, BBO#637049
                                              DENNER O'MALLEY, LLP
                                              Four Longfellow Place, 35th Floor
                                              Boston, MA 02114
                                              (617) 227-2800