**GREATER LOWELL PSYCHIATRIC ASSOCIATES**
R. P. Winfield, M.D. - Director
9 ACTON ROAD
CHELMSFORD, MA 01824

(978) 256-6579
FAX: (978) 256-1943

November 11, 2005

## PSYCHIATRIC FORENSIC REVIEW

RE:  United States v. Hana F. Al Jader

## I. Introduction

I was asked by Attorney Laura Malouf, attorney for Hana F. Al Jader to consider and/or form an opinion as to whether two Indonesian domestics who were employed by Ms. Al Jader – Trimurniyati Dzalipa and Rohimah Bakri, referred to hereinafter as "Sophia" and "Ro" respectively, may have made representations to authorities, which were not made of their free will: they were not voluntary.

## II. Opinion

**It is my opinion to a reasonable degree of medical certainty that there exists a substantial likelihood that representations made to authorities by Sophia and Ro regarding their choice not to speak to attorneys representing Ms. Al Jader were not voluntary.**

## III. Sources of Information

1. Interview of Naif Al Saud by this examiner on 11/10/05.
2. Interview with Reem Hejazi by this examiner on 11/10/05.
3. Affidavit of Reem Al Khadi dated October 2005.
4. Interview of Adwa Al Saud by this examiner on 11/10/05.
5. Affidavit of Adwa Al Saud dated November 2005.
6. Interview of Amaar Chammo by this examiner on 11/10/05.
7. Interview of Ali Hijazi by this examiner on 11/10/05.
8. Affidavit of Ali Hijazi dated November 2005.
9. Government's Opposition to Defendants's Motion for Access to Government Witnesses dated September 2, 2005

## IV. Data Surrounding the Events in Question

Naif Al Saud at his interview with this examiner stated the following:

1

- On the day that the "police" (federal, state, and/or local law enforcement officials) entered Hana Al Jader's home at approximately 9:30 am, Naif was asleep in bed and awakened by the police ordering people to wake up and assemble in the living room.
- The police entered his room, and were escorting and ushering people around the house with weapons drawn.
- Ro and Sophia were "very uneducated". Sophia is fluent in Arabic, but spoke only very limited English. Ro spoke minimal Arabic and no English.
- Naif observed the police taking Sophia and Ro aside and questioning them through what appeared to be a translator.
- Naif stated that the girls "looked scared" and at sometime during these proceedings, Hana helped "calm the girls down".
- Naif observed that the police "forced or herded" Ro and Sophia out the door of the house. They were then taken away by the police.


Reem Al Khadi stated in her interview and in her affidavit the following:
- She had been a friend of Hana and Hana's family for three to four years. In this context she also came to have frequent social contacts and with Ro and Sophia.
- She had visited Hana at her home on numerous occasions.
- During these visits she had come to know and develop a friendly relationship with Ro and Sophia.
- In or about October 2004 Sophia had visited Reem at her home: she was alone with Reem for a period of time.
- At no time during the period in which Sophia and Ro were living at Hana's, did Sophia or Ro appear to Reem to have been mistreated.
- At no time did Sophia or Ro complain to Reem of mistreatment, or complain that they were being held against their will.
- Sometime during the first week of January 2005, while in protective custody, Sophia and Ro contacted Reem by telephone at her home.
- During the three to five minute telephone conversation, Sophia told Reem that she loved Mama Hana. ("Mama Hana" is the term by which Ro and Sophia referred to Ms. Al Jader)
- In the same telephone conversation Sophia also told Reem that she wanted to speak to Mama Hana, but was not allowed to do so by the police.
- In that same telephone conversation Sophia told Reem that she wanted to return to work for Mama Hana, but whether she would be able to do so depended upon what the police eventually decided.
- During the same telephone conversation Sophia told Reem that she was being housed by the police.
- During that same telephone conversation Sophia told Reem that the police had represented to her that she would be allowed to attend school in order to learn English.

Adwa Al Saud stated in her affidavit and her interview the following:
- She is the daughter of Hana F. Al Jader and lives with her at 62 Cambridge Street, Winchester, Massachusetts.
- On the day that Sophia and Ro were taken into protective custody, between 20 and 30 armed police officers entered her home.
- She was in bed asleep in her home when the police came in and awakened her.
- After awakening the family and Sophia and Ro, the police had everyone sit in the living room. Hana was subsequently questioned individually, as were Sophia and Ro when a translator arrived.
- She saw police with weapons drawn, and others with holstered weapons.
- Adwa states that at no time during the period that Sophia and Ro were living with her did she observe any signs of their being mistreated.
- At no time during the period that Sophia and Ro were living with her did they complain to her of mistreatment or being held against their will.
- Adwa heard either Sophia or Ro crying outside the house near the front door, and calling out for "Mama Hana".
- The police stayed for most of the day and searched the entire house.
- When the police left they took nearly all of Sophia and Ro's belongings.
- Adwa states that Sophia and Ro "were like friends, really close to us." "We would always include them socially, and give them gifts."

Mr. Amaar Chammo stated in his interview the following:
- He was not present in the home when the police came. Amaar arrived at the house at approximately 12:00 noon after being contacted by one of Hana's children and also by a friend of the family.

Ali Hijazi states in his interview and affidavit the following:
- Ali Hijazi has known and visited Hana at her home on numerous occasions over the past two years.
- He came to know and "develop a friendly relationship" with Sophia and Ro.
- At no time during the period that he was visiting Hana's home did "Sophia or Ro appear to me to be mistreated."
- At no time while Sophia and Ro were living at Hana's did either complain to him of mistreatment or complain that they were being held against their will.
- On several occasions during the period of time Sophia and Ro were living with Hana, Mr. Hijazi observed that Sophia and Ro were alone in Hana's home.
- On several occasions during the time that Sophia and Ro were living with Hana, Mr. Hijazi "observed them walking alone along a moderately busy public street."
- After Sophia and Ro were placed in protective custody by the police they contacted Mr. Hijazi on three separate occasions, and on each occasion had a brief conversation.

3

- Mr. Hijazi states that during the first telephone conversation Sophia seemed to be "almost crying, and told me that the police did not let her use the telephone."
- During this first conversation Sophia inquired as to everyone's health, including Mama Hana's.
- In this first telephone call Sophia also indicated to Ali that she did not want the police to know that she had called him because "they don't like us to use the phone."
- Sophia also stated in this conversation that it was her belief that the police did not want her speaking with any of Hana's friends or family.
- Approximately three to four days later Ali received a second telephone call from Sophia. During this telephone conversation Sophia stated that she missed Mama Hana and wanted to return to her home.
- During the second telephone conversation Sophia told Ali that she was very happy because the government "lets her telephone her husband every day, and is going to let her husband come to the United States"
- Approximately three to four days after the second telephone conversation, Ali received a third call from Sophia.
- During one of the telephone conversations with Sophia, she stated that she was living with a policewoman.
- Shortly after the third telephone conversation with Sophia and Ro, Ali states that he was interviewed by the police at which time he informed them of the telephone calls. Thereafter he received no further telephone calls from Sophia or Ro.

The government represents in a September 2, 2005 " Opposition to Defendants's Motion for Access to Government Witnesses" that at some time between July and September of 2005: " After reflection, both {Sophia and Ro} declined to meet with defense counsel and be interviewed".

## V.  Summary, Discussion and Conclusions
The available evidence supports the following conclusions:
- On or around November 16, 2004 police entered the home of Hana F. Al Jader at approximately 9:30 A.M. while the family was sleeping. The police entered the home with weapons drawn, and ordered the family, and Sophia and Ro, to wake up. They then assembled everyone in the living room. Sophia and Ro were only minimally fluent in English.
- Sophia and Ro were subsequently questioned by the police through the use of a translator, who arrived later.
- Sophia and Ro were native to a country that had significantly fewer civil liberty protections than are enjoyed by American's. Sophia and Ro were taken away in police custody.
- Sophia and Ro were observed to be "scared" or "crying".

4

- Early in their protective custody Sophia and/or Ro expressed concerns about missing Hana, inquired as to her well being, and stated a desire to return to work for her.
- During the time that Sophia and Ro worked for Hana neither tried to escape, nor sought help escaping; nor did they state that they were being mistreated, despite numerous opportunities to do so to family, friends, or authorities.
- While in police custody, Sophia and Ro were allowed only limited contacts with others. These contacts were ones approved by the police.
- Sophia and Ro were housed with a member of the police.
- Sophia and Ro were allowed telephone contacts with some friends and family members.
- While in protective custody Sophia and Ro have not contacted Hana.

The available data supports the conclusion that there was a significant change in Sophia and Ro's expressed sentiment and behavior regarding Hana after they had been in protective custody, relative to their expressed sentiment and behavior while living with Hana. The magnitude of this change of feelings and attitudes is quite significant. A psychological explanation for this pre and post protective custody change is the condition known as the "Stockholm Syndrome". Quoting from *The Stockholm Syndrome; Not Just for Hostages* by Dee L. R. Graham, Edna Rawlings, and Nelly Rimini:

"The Stockholm Syndrome is an emotional attachment, a bond of interdependence between captive and captor that develops "when someone threatens your life, deliberates and doesn't kill you". (Symonds, 1980). The relief resulting from the removal of the threat of death generates the intense feelings of gratitude and fear, which combine to make the captive reluctant to display negative feelings toward the captor or terrorist. In fact, former hostages have visited their captors in jail, recommended defense counsel, and even started a defense fund. It is this dynamic which causes former hostages and abuse survivors to minimize the damage done to them and refuse to cooperate in prosecuting their tormentors."

"The victim's need to survive is stronger than his impulse to hate the person who has created his dilemma." (Strentz, 1980) The victim comes to see the captive as a "good guy", even a savior. This condition ..... occurs in response to the four specific conditions listed below:

1. A person threatens to kill another and is perceived as having the capability to do so.
2. The other cannot escape, so her/his life depends on the threatening person.
3. The threatened person is isolated from outsiders so that the only other perspective available to her/him is that of the threatening person.
4. The threatening person is perceived as showing some degree of kindness to the one being threatened.

The above are commonly agreed upon criteria in the body of writing on the Stockholm Syndrome, and similar conditions: ( including, but not limited to- abused wives, abused children, fraternity hazing, and cults )

The victim becomes hypervigilant to the abusers needs, and unaware of their own. The victim comes to see the world from the perspective of the abuser: they lose touch with their own perspective, which is unimportant; or may even be perceived as counterproductive.

The Stockholm Syndrome thus provides a model to understand significant changes in expressed sentiment, perception, affectual attachment, or statements of will. These changes are driven by a desire to please the captor, and improve captives chances and quality of survival.

The Stockholm Syndrome model represents a paradigm for a type of psychological coercion: the will of the captives has been subjugated to that of the captor. The development of the Syndrome, or syndrome-like conditions does not require intent on the part of the captor.

The four criteria enumerated above as producing Stockholm Syndrome are consistent with the pattern of events related to Sophia and Ro being taken into, and maintained in protective custody:

Number 1: *A person threatens to kill another and is perceived as having the capability to do so.* While it is doubtful that the police actually threatened to kill anyone in the home, the means of their entry, i.e. coming in with weapons drawn and yelling for people to get up and assemble in the living room, could easily be expected to put uneducated, non-English speaking women from a country that does not have the civil liberties protection enjoyed by the citizens of the United States, in reasonable fear for their lives. These events could as well create a reasonable perception that the armed police had the capability of killing them.

Number 2: *The other cannot, or believes he cannot, escape so his/her life depends on the threatening person.* The available evidence supports the fact that 20 to 30 armed officers entered Hana's home with weapons drawn, with additional officers outside. This would make escape essentially impossible at that time. While in protective custody there is evidence to support that there was an armed policewoman living with Sophia and Ro who was instrumental in limiting their contacts to chosen members of their family and friends. In addition, the evidence supports that Sophia and Ro did not know where they were being kept. The United States is a foreign country to them and neither spoke good English. These factors would all create a situation making escape from protective custody a daunting task.

Number 3: *The threatened person is isolated from outsiders so that the only other perspective available to her/him is that of the threatening person.* The situation as

described above that Sophia and Ro experienced while in protective custody supports the existence of this condition.

Number 4: *The threatening person is perceived as showing some degree of kindness to the one being threatened.* The available evidence supports that Sophia and Ro were allowed to make phone calls to friends and family, and had representations made to them that they would be allowed to attend school to learn English; Sophia's husband might be allowed to come to the United States.

Thus the events and conditions of Sophia and Ro's being placed in and maintained in protective custody are consistent with the criteria necessary to produce the psychological condition referred to as the Stockholm Syndrome.

As mentioned previously, the Stockholm Syndrome is a psychological response of a hostage, or an individual in a hostage-like situation, in which the more powerful person, a) has the power to put the individual's life in danger or at least the power to worsen the individuals prospect for the future life, and b) occasionally exercises this power in order to show that he/she is able to use it if the victim will not conform to the more powerful person's will. The primary symptom of this syndrome is a powerful psychological need for the individual to tailor his/her beliefs, loyalty, behavior and, indeed, <u>will</u> to conform to that of his captor.

The Stockholm Syndrome is a well-recognized psychological condition that has been written about in numerous psychology and psychiatry journals, and textbooks. It has been accepted as a subject for expert witness testimony in courts.

It should be recognized that an argument can be made that the behavior which Sophia and Ro exhibited while living with Hana: i.e. loyalty to her, an absence of attempts to escape, an absence of attempts to seek help or assistance for alleged mistreatment; may have been the result of a Stockholm Syndrome-like condition inflicted upon them by Hana. That is to say, they lived with her, she was perceived as a powerful person who had some degree of control over, if not their lives, at least over the quality of their future lives. Hana must, at times, have exercised that level of control in her role of employer and sponsor.

The weight of the available evidence, however, supports the conclusion that it was events surrounding Sophia and Ro being taken into protective custody, and the conditions under which they were maintained in protective custody, that was the precipitant of a Stockholm Syndrome-like condition, rather than their employment by Hana.

Without being able to perform a diagnostic interview with the women in question, it is not possible to state to a reasonable degree of medical certainty whether, in fact, they were suffering from a Stockholm Syndrome as a result of the events surrounding their

7

being placed in protective custody. However, the available evidence supports this conclusion.

Therefore, it is my opinion to a reasonable degree of medical certainty that there exists a substantial likelihood that while in protective custody Sophia and Ro developed signs and symptoms consistent with the condition known as the Stockholm Syndrome, as a result of which their behavior, and statements and expressed sentiments were driven by an intense desire to please their "captors" and was not, therefore, of their "free will"; thus, it was not <u>voluntary</u>.

The totality of the circumstances combined to create a compellingly coercive effect that would render statements to authorities non-voluntary: i.e. not the product of the exercise of free will.

## VI.  Credentials
My credentials are as set forth in the attached curriculum vitae.

<u>Addendum to curriculum vitae</u>: Cases in which I have testified or been deposed under oath in the last four years: Commonwealth Of Massachusetts v. Iodice; Commonwealth Of Massachusetts v. Zawadski; Commonwealth Of Massachusetts v. Whitson; Gedrich v. MIT; Young v. City of Lowell; United States v. Gilbert; Carelli v. Polaroid; Commonwealth Of Massachusetts v. Colburn; Carney, III v. Keleher, et. al.


_____
R.P. Winfield, M.D.



Win1112