IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 05-10085-RCL |
| HANA F. AL JADER | : | |

GOVERNMENT'S MEMORANDUM IN
OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

I.    INTRODUCTION

The United States of America opposes the defendant's Motion to Suppress Evidence.  As set forth below, the search warrant at issue was supported by probable cause to believe that crimes had been, and were still being, committed, and that evidence and instrumentalities of those crimes would be found at the defendant's homes.  The affidavit submitted in support of the warrant described detailed, first-hand information obtained from a named victim of the defendant's ongoing criminal activity, which included the confiscation of passports to maintain the forced labor of foreign servants and their unlawful harboring in the defendant's homes.  Information provided by a named victim was then corroborated and updated by review of government immigration records and by observations of the defendant's neighbors.  Thus, the magistrate had a substantial basis for issuing the search warrant.  Furthermore, the items seized during the execution of the search were properly seized under the plain view doctrine.  Even if the affidavit were not supported by probable cause, the evidence seized would nonetheless be admissible under the good faith exception

articulated in <u>United States v. Leon</u>, 468 U.S. 897 (1984).

II.  **STATEMENT OF FACTS**

On November 15, 2004, Magistrate Judge Joyce London Alexander of this Court issued a warrant authorizing the search of two residences of defendant Hana F. Al Jader, located about one-half mile apart, at 339 Mystic Street Arlington, MA and 62 Cambridge Street, Winchester, MA.  The warrants authorized the search for and seizure of three named Indonesian women, Tinamarina Amarudin, Indah Utom, and Legi Yanti Karto, and their personal identification, travel, and immigration documents, including visas and passports.  <u>See</u> Search Warrants, copies of which are attached as Exhibit 1. The search warrant application, a copy of which is also attached as Exhibit 2, was supported by the affidavit of FBI Special Agent Christa Snyder.

A.  **The Warrant Affidavit**

In her affidavit, SA Snyder, an agent with five years experience, recited that she was currently involved in an ongoing investigation concerning several aliens whom she had reason to believe were being unlawfully harbored at the defendant's house in Winchester, Massachusetts, in violation of Title 8, United States Code, Section 1324 ("Harboring").  SA Snyder also had reason to believe that the Indonesian women had their passports and immigration documents confiscated in order to maintain their services as domestic laborers, in violation of Title 18, United States Code, Section 1592(a)(3)("Document Servitude"). ¶2.

2

SA Snyder's reasonable belief was derived initially from her interview in February, 2004, with Veronica Pedroza, a Filipino national, who was a victim of the defendant's criminal activity. Ms. Pedroza had informed the Coalition to Abolish Slavery and Trafficking (CAST) in Los Angeles in December, 2003 that she and other women were unlawfully harbored at 339 Mystic Street, Arlington, Massachusetts, and had their passports and immigration documents confiscated by Hana Al-Jader, who also forced them to work for her. ¶3. In her interview with SA Snyder, Ms. Pedroza said Hana Al-Jader, the wife of Prince Mohammad Al-Saud of Saudi Arabia, had brought Ms. Pedroza and three Indonesian women from Saudi Arabia to the United States in February, 2000. ¶4a.,b. Ms. Pedroza had worked in Saudi Arabia as a domestic servant for Al-Jader's sister, and Al-Jader had promised Pedroza a salary of $500 per month before leaving Saudi Arabia. ¶4b.,c. Ms. Pedroza told SA Snyder that she recalled that two of the Indonesian women were named Indah and Tina. ¶4a.

After arriving in the United States, Ms. Pedroza was taken directly to the defendant's house at 339 Mystic Street, in Arlington. ¶4c. Pedroza then described to SA Snyder the domestic labor she and the other women were required to perform, on call 24 hours a day, including cooking, cleaning and caring for the disabled Prince. ¶4c. For her labor spanning five months in Saudi Arabia and the United States, Pedroza said she was paid only a total of

3

$200.

Pedroza then recounted to SA Snyder the threats, restrictions, and other acts taken by Al-Jader to compel the continued services of Pedroza and the Indonesian servants. She said that Hana Al-Jader confiscated all their passports and visas and placed them in a locked metal cabinet in her bedroom, located in the basement of the house. ¶4d. Al-Jader told Pedroza and the Indonesian females that they were not allowed to go outside of the house or to the store. Al-Jader told them she had their "papers" and if they left the house, the police would get them and put them in jail. Al-Jader told Pedroza that if she quit, she would be required to pay back the money it cost to bring her to the United States. Al-Jader did not allow Pedroza or the Indonesian women to use the telephone without her permission, and Al-Jader dialed the telephone for them when they wanted to place a call. ¶4e. After three to six weeks of this servitude, Pedroza escaped from 339 Mystic Street. ¶4f.

The affidavit then laid out the review of government records and other investigative steps that corroborated information provided by Pedroza. First, records of Immigration and Customs Enforcement (ICE) showed that temporary visitor business visas (B1) were issued in Riyadh, Saudi Arabia on January 31, 2000 in the names of Veronica Pedroza, Tinamarina Amarudin, Indah Utom, and Legi Yanti Karto. ¶5b. Second, ICE records showed that these women entered the United States through New York on February 4, 2000, they were legally

admitted until May 3, 2000, and their destination was listed as 339 Mystic Street, Arlington, MA. ¶5c.  A fourth Indonesian woman, Morniati Kadir, was also brought to the United States on February 20, 2001 on a B1 Visa, passport number AB727884 and listed as her destination 339 Mystic Street, Arlington, MA. ¶5d.  Third, the FBI interviewed a neighbor of close proximity to the defendant's house in Arlington who said that Al Jader seemed to always keep approximately three to four Indonesian maids at all times in her home and that some of these maids changed approximately every six months.  This same neighbor observed that the maids never left 339 Mystic Street, Arlington, MA by themselves.  ¶6b.

SA Snyder's affidavit then related other investigative steps that showed there was probable cause to believe that the three Indonesian servants were still working for Al Jader and/or that other evidence of their servitude would be found in the houses. First, ICE records showed that, as of November 10, 2004, none of the women had departed the United States.  ¶5e.  Second, it was learned through observations and interviewing a neighbor that Al Jader had moved to a house a 62 Cambridge Street, Winchester, MA.  Third, a neighbor of 62 Cambridge Street stated that, in August, 2004, she saw approximately four females, in their 20's, from the house waiting for a bus near the house.  ¶6c.  Fourth, the FBI interviewed a different neighbor who stated that he observed during August, 2004 approximately three females from 62 Cambridge Street, Winchester,

MA with a male waiting for a bus.  ¶6d.  Lastly, on or about October
22, 2004, a neighbor of 62 Cambridge Street stated that he observed
a female, who did not appear to be middle eastern, but had light
brown skin, cooking outside the residence of 62 Cambridge Street,
Arlington, MA on a gas grill.  ¶6e.

The affidavit then sought authority, based on the foregoing,
to search for the three named Indonesian women and their personal
identification and travel and immigration documents, including their
visas and passports, as evidence of document servitude and unlawful
harboring of aliens.

### B.    The Execution of the Search Warrants

On November 16, 2004, the warrants were executed at 62
Cambridge Street, Winchester and 339 Mystic Street, Arlington.  At
62 Cambridge Street, the defendant and her family were home asleep.
After the agents were allowed entrance, all the residents of the
house were accounted for.  None of the named Indonesian servants
were there.  However, there were two Indonesian domestic servants,
not named in the affidavit, Trimurniyati Bt Sukadi Dzalipa ("Tri")
and Rohimah Bt Lili Bakri ("Rohimah").  Through an interpreter, the
agents learned that Tri and Ro worked for the defendant for little
money, were not allowed to leave the house alone, and did not have
their own passports.  Tri and Ro did not want to stay in the house.
They gathered their possessions and left with some agents to be
interviewed and receive victim services.

The agents searched the house for passports and other personal identification documents, either of the three named Indonesian maids, and/or Tri and Rohimah.  When Al Jader was asked about the passports of the domestic servants, she provided a key to a safe located in her room.  Inside were passports in the names of Tri and Rohimah, as well as unused airline tickets to Saudi Arabia.  The agents also seized a ledger of salary payments to Tri and Ro.  They also seized some documents related to visa extension applications for Tri and Ro, including correspondence requesting a work contract to be supplied to the Bureau of Citizenship and Immigration Services.

The search of 339 Mystic Street, Arlington did not result in anything of evidentiary value.

**III.      THE DEFENDANT'S CLAIMS**

The principal claim advanced by the defendant is that the warrant affidavit failed to establish probable cause because, he alleges, (1) it did not support Pedroza's veracity, reliability and source of knowledge by sufficient corroboration; (2) it relied on unidentified sources and records; (3) it relied on unnamed neighbors without establishing their veracity; and (4) the information from Pedroza was stale.

**IV.  ARGUMENT**

**A.    The Affidavit Provided Probable Cause To Support Issuance of the Warrant**

In determining the sufficiency of an affidavit, the Court

7

considers whether the "totality of the circumstances" stated in the affidavit demonstrate probable cause to search the premises, "examin[ing] the affidavit in a common-sense and practical fashion" and according "'considerable deference to reasonable inferences the [issuing justice] may have drawn from the attested facts.'" <u>United States v. Barnard</u>, 299 F.3d 90, 93 (1st Cir. 2002). <u>quoting</u> <u>United States v. Zayas-Diaz</u>, 95 F.3d 105, 111 (1st Cir. 1996)(internal quotations omitted). A magistrate judge's determination of probable cause sufficient to support issuance of a search warrant is two-fold: that (1) a crime has been committed -- the "commission" element -- and (2) enumerated evidence of the offense will be found at the place to be searched -- the so called "nexus" element. <u>United States v. Feliz</u>, 182 F.3d 82, 86 (1st Cir. 1999); <u>Zayas-Diaz</u>, 95 F.3d at 111.

The magistrate's role is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before h[er] . . . there is a <u>fair probability</u> that contraband or evidence of a crime will be found in a particular place." <u>Feliz</u>, 182 F.3d at 86 (quoting <u>Illinois v. Gates</u>, 462 U.S. at 238)) (emphasis added). "The facts presented to the magistrate judge need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found." <u>Feliz</u>, 182 F.3d at 86 (quoting <u>Texas v. Brown</u>, 460 U.S. 730, 742 (1983)). "The probable cause standard 'does not demand showing that such a belief be

correct or more likely true than false.'" Id. In a "doubtful or
marginal case," the court "defers to an issuing magistrate's
'probable cause' determination." United States v. Greenburg, 410
F.3d 63, 65 (1st Cir. 2005), quoting Barnard, 299 F.3d at 93.

>    **1.    The Magistrate Could Rely in the
>           First Instance on the Credibility of
>           the Information Provided by Pedroza
>           Because she Was a Victim Supplying
>           First-Hand Information**

The defendant claims that the affidavit fails to show
Pedroza's reliability and basis of knowledge nor sufficiently
corroborates her information.  As an initial matter, this argument
is cast in the wrong framework because it treats Pedroza as an
informant rather than an identified crime victim providing
information.  The courts have consistently held that the "proof of
veracity rules which obtain in informant cases are not applicable
with respect to other sources of information," such as victims and
"citizen eyewitnesses." LaFave, Search and Seizure, §3.4(a), at
220-221 (4th Ed. 2004).  Nor is the same degree of corroboration
necessary when the information is not supplied by an unnamed
informant, but from an "average citizen reporting the commission of
a crime".  Id. at 224. See e.g., United States v. Patane, 304 F.3d
1013, 1017 (10 th Cir. 2002)("[T]he skepticism and and careful
scrutiny usually found in cases involving informants, sometimes
anonymous, from the criminal milieu, is appropriately relaxed if the
informant is an identified victim or ordinary citizen witness.");
United States v. Sparks, 265 F.3d 825, 830 (9th Cir. 2001)("This was
not an unreliable criminal informant, but a complaining victim who

9

had no apparent reason to lie."); <u>United States v. McKinney</u>, 328 F.3d 993, 994 (8th Cir. 2003)("[L]aw enforcement officers are entitled to rely on information supplied by the victim of a crime, absent some indication that the information is not reasonably trustworthy or reliable."); <u>United States v. Federbush</u>, 625 F.2d 246, 252 (9th Cir. 1980)(in search warrant affidavit, "[s]tatements of victim-witness to a crime need not be independently corroborated.").

Although the First Circuit has not apparently articulated clearly the different treatment of victims from informants, even if examined through the typical lens of informant information, Pedroza's information passes muster. In general, where the basis for the magistrate's probable cause finding was information provided by an informant, it must provide some information upon which the issuing magistrate judge can assess the credibility of the information. <u>Greenburg</u>, 410 F. 3d at 67. The First Circuit has adopted a "nonexhaustive list of factors" that a reviewing court will consider in a probable cause determination based on information from an informant. <u>Barnard</u>, 299 F.3d at 93. These factors include: "whether an affidavit supports the probable veracity or basis of knowledge of persons supplying hearsay information; whether informant statements are self-authenticating; whether some or all of the informant's factual statements were corroborated wherever reasonable and practical . . . ; and whether a law enforcement affiant included a professional assessment of the probable

10

significance of the facts related by the informant based on experience or expertise." <u>United States v. Khounsavanh</u>, 113 F.3d 279, 284 (1st Cir. 1997) (internal quotations omitted). Additionally, "[n]one of the factors is indispensable; and other indicia may be relevant." <u>Greenburg</u>, 410 F.3d at 68. The government need not "wholly eliminate[]" the risk that the informant is lying or is incorrect; "[r]ather, what is needed is that 'the probability of a lying or inaccurate informer has been sufficiently reduced by corroborative facts and observations.'" <u>Khounsavanh</u>, 113 F.3d at 284, <u>quoting</u> 2 W. LaFave, <u>Search and Seizure</u> 168 (3d ed. 1996).

Here, Veronica Pedroza was interviewed by the SA Snyder as a victim of the defendant's document servitude, not as someone providing hearsay information where the basis cannot be discerned. In addition to knowing from the affidavit Pedroza's status as a named victim, the magistrate could infer that Pedroza had been referred to the FBI through the Coalition To Abolish Slavery and Trafficking, which only reinforced her apparent credibility. In assessing the manner in which the information was provided, the magistrate appropriately considered that SA Snyder met with Pedroza personally and "had the opportunity to take measure of [her] credibility." <u>Greenburg</u>, 410 F.3d at 68 ("This sort of face-to-face contact between agent and informant supports the informant's reliability."). Pedroza also provided a first-hand account of her experiences at the hands of the defendant, which provided some

11

assurance of her reliability.  <u>See</u> <u>Barnard</u>, 299 F.3d at 93 ("The credibility of an informant is enhanced to the extent he has provided information that indicates first-hand knowledge."); <u>Illinois v. Gates</u>, 462 U.S. at 234 ("A specific, first-hand account of possible criminal activity is the hallmark of a credible tip."). Moreover, like the informant in <u>Greenburg</u>, Pedroza was known to the affiant, and thus "<u>could</u> be held responsible [to law enforcement] if her assertions proved inaccurate or false." <u>Greenburg</u>, 410 F.3d at 68.

   **2.  Pedroza's Information Was Sufficiently Corroborated and Probable Cause Was Not Stale**

   Even if required, the affidavit contained ample corroboration that reduced the risk that Pedroza was fabricating that she and three other Indonesian servants were held in forced labor by the defendant at her home.  First, Pedroza's information about their entry into the United States in February, 2000 was confirmed.  ICE records showed that BI visas for temporary visitor business were issued in Saudi Arabia for Pedroza, Tinamarina Amirudin, Indah Utom, and Legi Yanti Karto.  Pedroza had recalled two of her fellow servants were named "Tina" and "Indah."  Moreover, it was further learned from the review of ICE records that all arrived in New York and were destined to the defendant's house at 339 Mystic Street Arlington.[1]  While none of this corroborated specifically Pedroza's

_____

   [1]The defendant's argument that the affidavit did not particularize exactly which government records were reviewed does not seem to detract from the appropriate ability of the

report of the defendant's criminal conduct, "corroboration of even innocent activity reported in a tip may support a finding of probable cause." <u>Greenburg</u>, 410 F.3d at 69 (citation omitted). Here, the information tracked consistently between Pedroza's account and the ICE records, further supporting the credibility of her account, and lending itself to a conclusion that defendant Al Jader was engaged in a routine, ongoing course of conduct vis-a-vis her domestic servants.

Second, a current review of ICE records less than a week before the application showed no record of the three named Indonesian servants having left the United States. This further suggested they were still working for the defendant.

Third, SA Snyder obtained additional corroboration from a neighbor "of close proximity" to 339 Mystic Street that the defendant seemed to keep three or four Indonesian maids at all times in her home and that the maids were never observed leaving the house by themselves. These observations from a citizen further enhanced the accuracy of Pedroza's account of enforced isolation and compelled labor.

Third, the affidavit also reports the observations of at least two different neighbors of the defendant after she moved her household to 62 Cambridge Street, Winchester. One female neighbor stated that she saw in August, 2004, four females in their 20's from the defendant's house waiting for a bus. Another male neighbor also

---

magistrate to rely on the representations of the results of those record searches.

13

reported that he saw three females from the house with a male
waiting for a bus and that he observed a female, with light brown
skin, who did not appear to be middle eastern, cooking on a grill
outside the residence at 62 Cambridge Street.[2]

For reasons noted above, the defendant's attack on the this and
the other neighbors' reliability, whether named or not, misses the
mark. The law is clear that a "citizen informant" may generally be
presumed credible without subsequent corroboration. See LaFave,
§3.4(a), at 220-221. See also United States v. Blount, 123 F.3d
831, 835 (5th Cir. 1997)(unnamed neighbor's observations of crime
scene entitled to be accepted in warrant affidavit absent reason to
question motives or credibility). Here, the magistrate could accept
as true the reported neighbors' observations without any additional
specific indicia of reliability.

As for the corroborating information provided by the neighbors,
it bears remembering that SA Snyder only needed to corroborate
Pedroza's information to an extent "reasonable and practical."
Greenburg, 410 F.3d at 68 n. 3, quoting Zayas-Diaz, 95 F.3d at 111
(noting that direct questioning or more aggressive surveillance
might have caused the investigation to be discovered). That said,
the defendant focuses her attack on the strength of certain
individual strands of information from the neighbors. This

_____

[2]Defendant correctly points out that there is a
typographical error in ¶6e that erroneously lists 62 Cambridge
Street, *Arlington*, but the context makes it clear that it the
observations concern a light brown skinned female from 62
Cambridge Street, Winchester.

approach, however, fundamentally misapprehends the "totality of the circumstances" standard.  Under this standard, even where the facts "d[o] not corroborate each other with certainty," the question is whether "the combination of facts 'reduced the chances of a reckless or prevaricating tale [and] thus provid[ed] 'a substantial basis for crediting [an informant's statements].'"    United States v. Khounsavanh, 113 F.3d at 286 (quoting Gates, 462 U.S. at 244-45) (other citations and internal quotation marks omitted).

For example, one neighbor's description of seeing women in their 20's from the house waiting for a bus is not a sufficiently material difference from the actual ages of the Indonesian women of 35 and 36 to call into question the ultimate finding of probable Cause.  Nor does one neighbor's conclusory statement that "some of the maids changed approximately every six months" cancel out the fact that there were no departure records for the three named Indonesian women, much less remove probable cause to believe that, even if they had run away, their passports or other personal identification would still be there. See Greenburg, 410 F.3d at 68 (that a defendant may have identified inconsistency in affidavit not sufficiently compelling to call the magistrate's probable cause conclusion into question).  When viewed in the totality of the circumstances, the observations of the neighbors, including that three or four women, of a description generally corresponding to the Indonesian servants previously identified by Pedroza, resided at the defendant's homes as late as August, 2004 and that they never went out alone, added to the overall mix supporting a probable cause

finding.

As for the claim that Pedroza's information was stale because it was four years old, the defendant overlooks that "the function of a staleness test in the search warrant context is not to create an arbitrary time limitation within which discovered facts must be presented to a magistrate . . . Rather a staleness determination should be flexible." United States v. Spikes, 158 F.3d 913, 923 (6th Cir. 1998). See also United States v. Bervaldi, 226 F.3d 1256, 1264 (11th Cir. 2000)("There is no particular rule or time limit for when information becomes stale. . . Rather 'staleness is an issue which must be decided on the peculiar facts of each case.'"). Thus, the First and other circuit courts have considered such factors as the nature of the crime, the length of the criminal activity, the nature of the property to be seized and the place to be searched. See United States v. Feliz, 182 F.3d 182, 187 (1st Cir. 1993); United States v. Harris, 369 F.3d 1157, 1164-66 (10th Cir. 2004); United States v. Greene, 250 F.3d 471, 450 (6th Cir. 2001). Moreover, the law recognizes that subsequent corroboration will serve to "refresh" allegedly stale information. See Harris, 349 F.3d at 1166; Spikes, 158 F.3d at 924.

Here, the type of crimes under investigation -- unlawful harboring and document servitude -- were ongoing and protracted and not discrete. See Greene, 250 F.3d at 450 ("Evidence of ongoing criminal activity will generally defeat a claim of staleness."). The neighbors' observations and lack of any record of departure from the country confirmed the probability that the defendant continued

to keep the Indonesian maids in servitude.    See United States v. Canaan, 48 F.3d 954, 958 (6th Cir. 1995)(though conduct described in affidavit was four years old, evidence of ongoing nature defeated claim of staleness).    Furthermore, the kind of place to be searched -- the defendant's residences -- was not transient but a permanent locus of the suspected criminal activity of forced labor.    See Greene, 250 F.3d at 450 (place to be searched was defendant's home suggesting there was some permanence to defendant's base of operations).    Lastly, the passports and other identification documents to be seized were likely to still be possessed and concealed by the defendant because it was one of her ways to compel the servants' isolation and labor.[3]

In sum, the affidavit provided the magistrate with a "substantial basis upon which to conclude that was a fair chance" that evidence of the defendant's unlawful harboring and document servitude would be found at the defendant's houses.    See Illinois v. Gates, 462 U.S. at 235 (probable cause requires only probability, not a prima facie showing).

C.  **Even If the Affidavit Did Not Establish Probable Cause, the Search Was Valid under the Leon Good Faith Exception to the Exclusionary Rule**

In United States v. Leon, 468 U.S. 879 (1984), the Supreme Court held that even in the absence of probable cause, the

---

[3]Indeed, the passports of Tri and Ro were kept in a safe in the defendant's bedroom, exactly where Pedroza had said the defendant kept hers and those of the three Indonesian servants.

17

exclusionary rule should apply only where excluding evidence would have a substantial deterrent effect on the police. Thus, even where a warrant was not supported by probable cause, evidence should not be suppressed where the executing officers reasonably relied in good faith on a facially valid warrant. *See* United States v. Owens, 167 F.3d 739, 747 (1st Cir. 1999). While the Leon good faith exception will not apply "when the magistrate ... was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth," the exception will apply where the misstatement was the result of negligence or innocent mistake. Id. at 745 (citations omitted). The defendant advances no such claim of deliberately false statements or reckless disregard for the truth.

Moreover, even if the affidavit did not establish probable cause, none of the other exceptions to Leon apply. It clearly was not "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" Leon, 468 U.S. at 923, quoting Brown v. Illinois, 422 U.S. 590, 610-611 (1975) (Powell, J., concurring in part). Suppression is not an appropriate remedy where the warrant, although defective, is based upon "evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause." Leon, 468 U.S. at 926.[4]

---

[4]Nothing suggests that the magistrate judge "abandoned her neutral and detached role" or acted as a rubber stamp, nor has the defendant argued as much. See United States v. Brunette, 256

Thus, even if this Court were to disagree with the magistrate's determination of probable cause, where the agents relied in good faith on the validity of the search warrants, this Court should not suppress the evidence.

**D.   The Evidence Was Seized by the Agents Under the Plain View Doctrine**

As noted above, although the three Indonesian domestic servants named in the warrant were not found in the house, different Indonesian servants were.   Tri and Ro briefly described their circumstances which were consistent with those of the victims described in the affidavit.   In particular, they told the agents that they did not have their passports, were not permitted to go out, and worked for little money.   They also wanted to leave. Subsequently, passports and other visa application in their names were discovered and seized by the agents.

The plain view doctrine requires that: (1) the officer(s) must be lawfully present at the site of the search and see the evidence in plain view; and (2) the seized evidence must have an "immediately apparent" link to criminal activity.   <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 467 (1971); <u>Horton v. California</u>, 496 U.S. 128, 141 (1990); <u>United States v. Perrotta</u>, 289 F.3d 155 (1st Cir. 2002).   In order to satisfy the "immediately apparent" prong of the plain view exception, the same standard applies as would for the issuance of a warrant – probable cause to believe that the object

---

F.3d 14, 19 (1st Cir. 2001), <u>citing</u> <u>Leon</u>, 468 U.S. at 923.

19

is linked to crime.  See Arizona v. Hicks, 480 U.S. 321, 326-27 (1987); see also United States v. Rutkowski, 877 F.2d 139, 142 (1st Cir. 1989).  Probable cause, however, is measured from the viewpoint of all of the searchers, not simply the one who happened upon the evidence.  See id.; United States v. Johnston, 784 F.2d 416, 420 (1st Cir. 1986).

Here, the agents reasonably believed that the affidavit for the warrant established probable cause to believe that in the house there were several Indonesian domestic servants who were victims of forced labor, induced, in part, by the confiscation of their passports by Al Jader, who also was harboring them unlawfully. Thus, even though the three women were no longer there, the agents were authorized under the warrant to search for evidence of these committed crimes.  However, the discovery of Tri and Ro in the same apparent victim situation added a new layer of probable cause under the plain view doctrine.  That is because information legally obtained during a search can create the probable cause needed to seize further items in plain view during that same search.  United States v. Hamie, 165 F.3d 80,83 (1st Cir. 1999); see also United States v. Giannetta, 909 F.2d 571, 577 (1st Cir. 1990) (allowing search with expanded scope in light of discovery of new evidence during the search); United States v. Aguirre, 839 F.2d 854 (1st Cir. 1988) (holding that evidence found in plain sight, combined with material in original warrant can "close[] any remaining gap in the

20

circle" of probable cause).  For example, in <u>Hamie</u>, federal agents searched the defendant's home pursuant to a warrant naming his roommate and authorizing a search for evidence that the roommate was engaged in credit card fraud.[5]  165 F.3d at 81.  During the course of the search, the agents found multiple identification cards bearing Hamie's photo, but with false names, as well as credit cards with those same false names.  <u>Id.</u>, at 81-82.  The court held that once the agents uncovered this evidence, in conjunction with their previous suspicion of Hamie, "the incriminatory nature of any other items in those names became immediately apparent to the agent." <u>Id.</u>, at 83.

Here, the agents' prior probable cause to suspect Al Jader of the enumerated crimes against Pedroza and Indonesian servants (endorsed by a magistrate judge), combined with the information gleaned from Tri and Ro during the search, established the evidentiary nature of any employment or immigration documents related to the two women.  Additionally, these facts present even a stronger case than in <u>Hamie</u>, since the evidence obtained here was against the same suspect the search warrant named, and was of the exact type specified in the warrant.[6]

---

[5] Though the agents suspected Hamie of engaging in such fraud as well, they secured a warrant only to search for evidence implicating the roommate because they felt they lacked probable cause to get such a warrant for Hamie.  <u>See Hamie</u>, 165 F.3d at 81.

[6] The fact that the agents had to first read the names on the passports or other documents to appreciate their incriminatory

Thus, the seizure of the passports and other immigration and employment related documents was fully lawful under the plain view doctrine.

**V.  CONCLUSION**

For the foregoing reasons, defendant's motion to suppress evidence should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /s/ S. Theodore Merritt
S. THEODORE MERRITT
Assistant U.S. Attorney

LOU DeBACA
Special Litigation Counsel
Criminal Section
Civil Rights Division
U.S. Department of Justice

---

nature is of no consequence to the application of the plain view doctrine.  See United States v. Calloway, 116 F.3d 1129, 1133 (6th Cir. 1997) (allowing seizure of documents when warrant authorized search for unrelated documents, and noting that in a search for documentary evidence, "[u]nless they were to seize every scrap of paper in the apartment, the agents had to examine such documents as they came across."); United States v. Soussi, 29 F.3d 565, 572 (10th Cir. 1994) ("Along with numerous other circuits, we have upheld the plain view seizure of documents even when the police only learned of the documents' incriminating nature by perusing them during a lawful search for other objects"); United States v. Santarelli, 778 F.2d 609, 615-16 (11th Cir.1985) ("Given the fact that the search warrant entitled the agents to search for documents ..., it is clear that the agents were entitled to examine each document ... to determine whether it constituted evidence they were entitled to seize under the warrant.")

AO 93 (Rev. 8/98) Search Warrant

# UNITED STATES DISTRICT COURT

DISTRICT OF ___MASSACHUSETTS___

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

62 Cambridge Street, Winchester, MA.
A three-story single family home, with a red brick front and
white siding on each side of the home

**SEARCH WARRANT**

CASE NUMBER: *MJ04-M-262JLA*

TO: _____Special Agent Christa J. Snyder_____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _____Special Agent Christa J. Snyder_____ who has reason to
                                                                    Affiant

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

62 Cambridge Street, Winchester, MA.
A three-story single family home, with a red brick front and white siding on each side of the home

in the _____ District of _____Massacusetts_____ there is now

concealed a certain person or property, namely (describe the person or property)

The persons of Tinamarina Amirudin, Indah Utom, and Legi Yanti Karto and their personal identification, travel and immigration
documents, including visas and passports

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property
so described is now concealed on the person or premises above-described and establish grounds for the issuance of this
warrant.

YOU ARE HEREBY COMMANDED to search on or before _____11/25/04_____
                                                                                              Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and
making the search (in the daytime -- 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause
has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and
receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly
return this warrant to _____The Honorable Joyce London Alexander_____

as required by law.                                    U.S. Judge or Magistrate Judge

_11/15/04    5:55 P.M._         at    Boston, MA
Date and Time Issued                          City and State

Joyce London Alexander, U.S. Magistrate Judge

Name and Title of Judicial Officer            Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

# UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

339 Mystic Street, Arlington, MA
A two story, single family home with white siding and grey
and black shutters and a two-car attached garage

## SEARCH WARRANT

CASE NUMBER: *MJ04-M 261 JLA*

TO: _____ Special Agent Christa J. Snyder _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _____ Special Agent Christa J. Snyder _____ who has reason to
                                                                          Affiant

believe that ☐ on the person of or ☒ on the premises known as (name, description and/or location)

339 Mystic Street, Arlington, MA
A two story, single family home with white siding and grey and black shutters and a two-car attached garage

in the _____ District of _____ Massacusetts _____ there is now

concealed a certain person or property, namely (describe the person or property)

The persons of Tinamarina Amirudin, Indah Utom, and  Legi Yanti Karto and their personal identification, travel and immigration
documents, including visas and passports

I am satisfied that the affidavit(s) and any record testimony establish probable cause to believe that the person or property
so described is now concealed on the person or premises above-described and establish grounds for the issuance of this
warrant.

YOU ARE HEREBY COMMANDED to search on or before _____ 11/25/04 _____
                                                                                          Date

(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and
making the search (in the daytime -- 6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause
has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and
receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly
return this warrant to _____ The Honorable Joyce London Alexander _____
as required by law.                                           U.S. Judge or Magistrate Judge

_11/15/04_     _5:54 P.M._     at     Boston, MA
Date and Time Issued                            City and State

Joyce London Alexander, U.S. Magistrate Judge
Name and Title of Judicial Officer                     Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

**DISTRICT OF** Massachusetts

| | |
|---|---|
| In the Matter of the Search of | |
| (Name, address or brief description of person, property or premises to be searched) | **APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT** |

339 Mystic Street, Arlington, MA
A two story, single family home with white siding and
grey and black shutters and a two-car attached garage

CASE NUMBER:

I _____ Special Agent Christa J. Snyder _____ being duly sworn depose and say:

I am a(n) _____ Special Agent with the FBI _____ and have reason to believe
                        Official Title

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

339 Mystic Street, Arlington, MA
A two story, single family home with white siding and grey and black shutters and a two-car attached garage

in the _____ District of _____ Massachusetts

there is now concealed a certain person or property, namely (describe the person or property to be seized)

The persons of Tinamarina Amirudin, Indah Utom, and Legi Yanti Karto and their personal identification, travel and immigration documents, including visas and passports

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
evidence, fruits, and instruments of the crime of harboring illegal aliens

concerning a violation of Title _____ 8 _____ United States code, Section(s) _____ 1324 _____

The facts to support a finding of Probable Cause are as follows:

See Affidavit of Special Agent Christa J. Snyder, attached hereto and made a part hereof

Continued on the attached sheet and made a part hereof.     ☒ Yes     ☐ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

_____ at   Boston, MA
Date                                                    City and State

Joyce London Alexander, U.S. Magistrate Judge     _____
Name and Title of Judicial Officer                          Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

## AFFIDAVIT

Special Agent Christa J. Snyder, Federal Bureau of Investigation, being duly sworn, hereby deposes and states the following:

1.    I am employed as a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed for five years.

2.    As a Special Agent of the FBI, I am currently involved in an ongoing investigation concerning several aliens whom I have reason to believe are being unlawfully harbored at a house in Winchester, Massachusetts and who have had their passports and immigration documents confiscated in order to maintain their services as domestic laborers, in violation of Title 8, United States Code, Section 1324 and Title 18, United States Code, Section 1592(a)(3). Because this affidavit is being submitted for a limited purpose, I have not included details of every aspect of this investigation. Where conversations or statements are related herein, they are related in substance and in part. The information contained in this affidavit is based upon my own observations, as well as on information obtained by me from other federal agents.

3.    In the course of my duties, in approximately March, 2004, I received information that in or about December 9, 2003, an alien by the name of Veronica Pedroza, a Filipino national, approximately 31 years-old, informed the Coalition to Abolish Slavery and Trafficking (CAST) in Los Angeles that she and other

women were unlawfully harbored at 339 Mystic Street, Arlington,
Massachusetts, and had their passports and immigration documents
confiscated by Hana Al-Jader, who also forced them to work for
her. After review of immigration records and interviews with
witnesses, it is believed that four additional female aliens were
unlawfully harbored and forced to perform labor at 339 Mystic
Street, Arlington, MA and that three are currently in that
situation at 62 Cambridge Street, Winchester, MA. The names of
these women are Indah Utom, an Indonesian national, 36 years-old;
Tinamarina Amirudin, an Indonesian national, 35 years-old; Legi
Yanti Karto, an Indonesian national, 35 years-old; and Morniati
Kadir, an Indonesian national, 35 years-old.

     4.    In February, 2004, I interviewed Veronica Pedroza and
learned the following information:

          a.    Pedroza and three Indonesian women were brought
from Saudi Arabia to the United States by Hana Al-Jader in
February, 2000. Pedroza recalled that two of the Indonesian
women were named Indah and Tina. Pedroza had worked for the
sister of Hana Al-Jader in Saudi Arabia as a domestic
servant.

          b.    Hana Al-Jader is the wife of Prince Mohammad Al-
Saud of Saudi Arabia.

          c.    Al-Jader promised Pedroza $500.00 per month in
salary prior to leaving Saudi Arabia. Upon arriving in the

United States, Pedroza was taken directly to a house at 339
Mystic Street, Arlington, MA, where she resided as a
domestic laborer.  The domestic labor included the care of
Prince Al-Saud, who is disabled; Hana Al-Jader's personal
needs; and cooking and cleaning.  Pedroza and the Indonesian
women were forced to be available twenty-four hours a day.
After working for a total of approximately five months as a
domestic laborer in both Saudi Arabia and the United States,
Pedroza was paid only a total of $200.  When Pedroza often
asked Al-Jader when she would be paid as promised, Al-Jader
responded by yelling at Pedroza.

        d.    When Pedroza arrived in the United States, Hana
Al-Jader confiscated Pedroza's immigration papers, including
her visa and passport, and placed them in a locked metal
cabinet in Al-Jader's bedroom, located in the basement of
339 Mystic Street, Arlington, MA.  The passports of the
Indonesian workers were also confiscated and placed in this
same cabinet.

        e.    Hana Al-Jader told Pedroza and the Indonesian
females that they were not allowed to go outside of the
house or to the store.  Al-Jader told them she had their
"papers" and if they left the house, the police would get
them and put them in jail. Al-Jader told Pedroza that if she
quit, she would be required to pay back the money it cost to

3

bring her to the United States.  Al-Jader did not allow
Pedroza or the Indonesian women to use the telephone without
her permission, and Al-Jader dialed the telephone for them
when they wanted to place a call.

     f.   Approximately three to six weeks after arriving in
the United States, Pedroza escaped from 339 Mystic Street
and took refuge with a Filipino woman whose name she got out
of the telephone book.

5.  Agents from the FBI and from Immigrations and Customs
Enforcement (ICE) learned the following information from the
review of records and observations:

     a.   Hana Al-Jader owns two homes:  339 Mystic Street,
Arlington, MA and 62 Cambridge Street, Winchester, MA. The
two homes are approximately one-half mile apart on the same
road, which changes names at the town line.

     b.   Temporary Visitor for Business Visas (B1) were
issued in Riyadh, Saudi Arabia on January 31, 2000 in the
names of Veronica Pedroza, Tinamarina Amirudin, Indah Utom,
and Legi Yanti Karto.

     c.   The above-named females entered the United States
through New York, NY on February 4, 2000, and they were
legally admitted until May 3, 2000, and their destination
was listed as 339 Mystic Street, Arlington, MA.  Their
passport numbers were as follows:  Pedroza - DD076888,

4

Amirudin - AB404954, Utom - AA858899, Karto - AB329165.

    d.    Record checks further revealed the name of another female, Morniati Kadir, an Indonesian national, who was brought to the United States on February 20, 2001 on a B1 Visa, passport number AB727884 and listed as her destination 339 Mystic Street, Arlington, MA.

    e.    Record checks revealed that Amirudin, Utom, and Karto Kadir have not departed the United States as of November 10, 2004.

6.    FBI agents learned the following information through interviews of neighbors of 339 Mystic Street, Arlington, MA and 62 Cambridge Street, Winchester, MA:

    a.    On approximately June 25, 2004, FBI agents learned that Hana Al-Jader moved from 339 Mystic Street to 62 Cambridge Street, Winchester, MA.

    b.    On approximately June 25, 2004, FBI agents learned from a neighbor of close proximity to 339 Mystic Street, Arlington, MA that Al-Jader seemed to always keep approximately three to four Indonesian maids at all times in her home, and that some of these maids changed approximately every six months. This same neighbor observed that the maids never left 339 Mystic Street, Arlington, MA by themselves.

    c.    On or about September 23, 2004, a neighbor of 62

5

Cambridge Street stated that she had observed, during August, 2004, approximately four females, in their 20's, from 62 Cambridge Street, Winchester, MA waiting for a bus near the house.

     d.   On or about October 21, 2004, a neighbor of 62 Cambridge Street stated that he observed during August 2004 approximately three females from 62 Cambridge Street, Winchester, MA with a male waiting for a bus.

     e.   On or about October 22, 2004  a neighbor of 62 Cambridge Street stated that he observed a female, who did not appear to be middle eastern, but had light brown skin, cooking outside the residence of 62 Cambridge Street, Arlington, MA on a gas grill.

   7.   For the foregoing reasons, there is probable cause to believe that evidence, fruits, and instrumentalities of the crime of harboring illegal aliens, in violation of Title 8, United States Code, Section 1324, and of the crime of confiscating and possessing a passport and other immigration documents to prevent or restrict, without lawful authority, a person's liberty to move or travel, in order to maintain the labor or services of that person, when the person has been a victim of a severe form of trafficking in persons, in violation of Title 18, United States Code, Section 1592(a)(3), are located and concealed within the residences of Hana Al-Jader at 339 Mystic Street, Arlington, MA

and 62 Cambridge Street, Winchester, MA, including within locked cabinets.  This evidence is believed to include the persons of Tinamarina Amirudin, Indah Utom, and  Legi Yanti Karto and their personal identification and travel and immigration documents, including their visas and passports.

8.    339 Mystic Street, Arlington, MA, is a two story, single family home with white siding and grey and black shutters and a two-car attached garage. 62 Cambridge Street, Winchester, MA, is a three-story single family home, with a red brick front and white siding on each side of the home.


_____
CHRISTA J. SNYDER, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


    Sworn and subscribed before me this ___ day of November, 2004.


_____
JOYCE LONDON ALEXANDER
UNITED STATES MAGISTRATE JUDGE

7