UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 05-10085-RCL |
| | ) | |
| HANA F. AL JADER | ) | |

**DEFENDANT'S FIRST MOTION IN LIMINE
TO EXCLUDE EVIDENCE**

Defendant Hana F. Al Jader hereby moves in limine for an order precluding the government from offering the following allegations at trial. The government has charged Ms. Al Jader essentially with imprisoning her family's two Indonesian domestic employees, known as Sophia,[1] a cook, and Rohimah, a maid, and forcing them to provide domestic services to Ms. Al Jader's family in the United States from February 13, 2003 through November 16, 2004. Despite the narrow focus of the charges in the indictment and the confined time period of alleged wrongdoing, the government has given notice that it intends to offer bad acts / bad character evidence at trial, specifically, allegations of mistreatment of *other* domestic employees as far back as 1995.

Because none of those allegations have any "tendency to make the existence of any fact of consequence … more or less probable," they are inadmissible under Rule 401 for that reason. *See* Fed. R. Evid. 401 and 402. More importantly, the allegations constitute precisely the type of inadmissible bad character, bad acts or propensity

---

[1] The government and its witnesses will refer to this employee as "Tri," which is a shortened version of her first name, Trimurnyati. Ms. Al Jader, her family and her friends, many of whom will testify at trial, called and know her as Sophia.

evidence expressly excluded by Fed. R. Evid. 404.  Even if the allegations were relevant and probative, the court should still exclude them because whatever probative value they could have would be minimal and "substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence."  *See* Fed. R. Evid. 403.  Indeed, permitting the government to offer the allegations would likely prolong the trial substantially and would create a significant and entirely avoidable risk that Ms. Al Jader would be convicted on propensity or bad character, not on proof of the charges the government brought.

### The Indictment and Expected Evidence At Trial

On November 16, 2004, more than 30 armed government agents, guns drawn, executed a search warrant at Ms. Al Jader's home at 62 Arlington Street, Winchester.  The agents herded Ms. Al Jader and her children into a room and immediately removed Sophia and Rohimah from the premises.  The government has kept their precise locations a secret to this day.  More than four months later, the government indicted, arrested and moved for the detention of Ms. Al Jader, who spent several days in jail before Magistrate Judge Alexander released her on conditions that presently include house arrest with electronic monitoring.

The Indictment charges that from the time Sophia and Rohimah entered the United States in February 2003 until November 16, 2004, Ms. Al Jader obtained their domestic services by threats of serious harm and physical restraint, confiscated and kept their passports to prevent them from leaving and refused to permit them to leave the premises unaccompanied.  The government has manufactured four counts out of this

2

alleged conduct: two counts of forced labor in violation of 18 U.S.C. § 1589 and 1594; and two counts of document servitude in violation of 18 U.S.C. § 1592.

The indictment also charges that Ms. Al Jader presented false employment contracts for Sophia and Rohimah to immigration in December, 2003 to obtain visa extensions and thereby committed visa fraud in violation of 18 U.S.C. § 1546 and records falsification in violation of 18 U.S.C. § 1519. The government alleges that the employment contracts were false because they provided that Sophia and Rohimah each would receive $1,500 per month and would be required to work eight-hour days. The government alleges that they were in fact on call 24 hours per day, seven days per week and received only $300 each per month.

The final counts allege that at some point Sophia and Rohimah were in the United States illegally and that, knowing that, Ms. Al Jader harbored them at her home in violation of 8 U.S.C. § 1324.

Ms. Al Jader will vigorously contest the charges. Discovery provided by the government reveals absolutely no support whatsoever for any type of physical restraint of Sophia and Rohimah, no threats of "serious harm" as that term is used in the forced labor statute, no pattern or scheme of physical restraint or threats of serious harm and no abuse or threatened abuse of the legal process – hence, there can be no violation of the forced labor statute. *See* 18 U.S.C. § 1589.

Indeed, Sophia and Rohimah were not confined or restricted in any way. Discovery and defense investigation reveal that they regularly left the premises in the company of many different members of Ms. Al Jader's family and friends of the family, regularly went outside the home to cook, wash cars, sweep or exercise, had unfettered use

of the telephone to call whomever they wanted, had a ready supply of pre-paid phone calling cards and used the telephone extensively to phone family in Indonesia. There will be testimony that Rohimah and/or Sophia knew that their passports were kept in a lock box along with the passports of all members of Ms. Al Jader's family, knew where the box was, had possession of the key and access to the box.

Finally, many people who visited the home and stayed overnight for extended periods of time will testify that Ms. Al Jader treated Sophia and Rohimah like family. Those witnesses will testify that Ms. Al Jader would care for her husband, cook meals when she was entertaining and clean up along with her guests after Sophia and Rohimah had gone to bed. They worked nothing remotely close to the 24 hours per day seven days per week schedule the government has alleged.

The government is well aware of the favorable evidence that Ms. Al Jader will be able to present at trial regarding the treatment Sophia and Rohimah received in Ms. Al Jader's home. Agents have interviewed many of the witnesses Ms. Al Jader will call. That should be the focus of this trial – did Ms. Al Jader essentially imprison Sophia and Rohimah and force them to work against their wills.

Instead, the government wants to introduce allegations that Ms. Al Jader and members of her family mistreated other domestic employees as far back as 1995, more than ten years ago. That evidence, described and categorized below, is irrelevant and inadmissible.

**Argument**

1.   **The Court Should Exclude Evidence Of Alleged Mistreatment of Domestic Employees In 1995**

Ms. Al Jader's husband, Mohammad Al Saud, is disabled as a result of an automobile accident.  He cannot walk and is confined to a wheelchair.  He cannot speak normally and communicates by pointing to an alphabet card.  He received medical treatment and rehabilitation therapy in the United States and was an inpatient at the Spaulding Rehabilitation Hospital in 1995.  Ms. Al Jader moved to the United States to be able to assist her husband.  She brought several domestic employees with her.  One of them, Jesse Obispo, lived for a period of time at Spaulding with Ms. Al Jader's husband.

The government intends to offer allegations through Obispo that Ms. Al Jader held Obispo's passport in an unlocked drawer in the hospital room, along with the passports of the other employees, did not pay Obispo for four months and did not permit her to leave the hospital unaccompanied.  Obispo will also testify that she was able to take her passport and leave with the help of Grace Brown, a nurse who worked at Spaulding, and Brown's husband, Neal, a Hingham attorney.

The government also intends to call Neal Brown who will allege that he and his wife helped Obispo leave the hospital and become a legal resident.  Brown will allege that as part of an effort to intimidate Ms. Al Jader into paying money to Obispo, Brown likened her treatment of Obispo to slavery and told her that she was not in Saudi Arabia any more.

The testimony of Obispo and Brown about Ms. Al Jader's alleged conduct in 1995 – eight years before Tri and Rohimah entered the United States and lived in Ms. Al Jader's household – is irrelevant and constitutes inadmissible bad character / bad act

5

evidence. Admission of the allegations could cause the jury to conclude that Ms. Al Jader hid passports in 1995 and must have done the same thing in 2003 and 2004, which Rule 404(b) expressly forbids. The court should not admit evidence that would create the potential for conviction based on propensity particularly where, as here, the proffered allegations are stale and possess no special relevance.

The government's stated reason for offering Obispo's testimony and Brown's opinions about Ms. Al Jader's alleged conduct is to show that she "was informed that she could not treat her household employees" in a manner Brown disagreed with and was thus "put on notice of the wrongfulness of her conduct, … ignored the warnings and responded by henceforth locking in a safe the passports of the servants, including Tri and Rohimah's." Government's Local Rule 117(A) disclosure, dated August 15, 2006. The proffered allegations are incapable of serving this purpose and should be excluded.

The Court of Appeals for the First Circuit recently held that the trial court should be very careful in admitting evidence of alleged past mistreatment of previous employees in a forced labor/document servitude prosecution based on current treatment of different employees. *See United States v. Bradley*, 390 F.3d 145 (1st Cir. 2004). The defendant in *Bradley* was charged with forced labor and document servitude arising from the recruitment of laborers in Jamaica by a New Hampshire tree removal company. The trial court permitted the government to offer evidence of alleged mistreatment of other workers the defendant had recruited in the past. The First Circuit noted that such testimony was "closer to the margin" of inadmissible bad acts, noted that such evidence could be relevant to intent or plan but cautioned that "bad acts comprising most criminal careers form a pattern, so, taken too broadly, the exception could be made to swallow the

6

rule." *Id*. at 155. The First Circuit ultimately upheld admission of the bad acts evidence finding that it did have special relevance to motive.

This court should not reach the same conclusion in this case because the allegations the government proffers here are different in kind from the evidence deemed admissible, barely so, in *Bradley*. In *Bradley*, one former employee allegedly had fled New Hampshire and was pursued by the defendant, who threatened to beat and kill him. After that former employee fled, the defendant took the passport and plane tickets of the other former employee who had not fled. *Id*. at 148-149. The court held that these circumstances "give a malign motive for, and provide the context of, the later seizure of [current employees'] passports and of the initial threat to them based on [defendant's] supposed intention to 'destroy' a former worker." *Id*. at 155.

The alleged circumstances regarding Obispo are nothing like that. Ms. Al Jader did not confiscate any passports, including Sophia's and Rohimah's, in reaction to the flight of an employee. It is common and customary for Saudi Arabian employers to keep safe the passports of their domestic employees. Even Sophia and Rohimah will testify to that.

Unlike the circumstances in *Bradley*, Ms. Al Jader did not take or "confiscate" Obispo's passport at all. The government's evidence is that she gave Obispo her own passport and the passports of other employees and asked her to keep them in an unlocked drawer to which Obispo had free and continuous access. Nor did Ms. Al Jader take or "confiscate" the passports of Sophia and Rohimah. Numerous witnesses will testify at trial that Rohimah keys to all of the locked doors and storage areas of the house and that they had regular access to all such areas. The most important distinction between

7

*Bradley* and this case is that there will be no evidence here that Ms. Al Jader hunted down and threatened a fleeing employee or made any effort to make that employee return to her employ.

It was the harrowing circumstances in *Bradley* that made the bad acts evidence regarding former employees probative of the defendant's motive in confiscating the passports of his current employees. The complete absence of similar circumstances here renders the government's proffered evidence irrelevant, inadmissible, bad character propensity evidence.

As for Brown's testimony about what he supposedly said to Ms. Al Jader, it is not relevant or probative in the slightest. The government's assertion that Brown's allegations that he told Ms. Al Jader that she was in America now and had to obey American laws about paying her workers somehow constitutes notice of the wrongfulness of different criminal conduct the government has charged her with committing eight years later is absurd. Brown was a civil lawyer acting on Obispo's behalf to extract money from Ms. Al Jader. The notion that everything a civil lawyer says to advance the cause of his client is the gospel as to what the law requires does not reflect reality. Treating a civil advocate's opinions on the law as the equivalent of informing the listener of the intent requirements of criminal statutes – here, very specific *mens rea* requirements of very specialized criminal statutes – would be unparalleled.

It would be particularly reckless to admit Brown's testimony here for the entirely separate reason that he was not confronting Ms. Al Jader about forced labor, document servitude or any of the other alleged criminal conduct the government has charged. He thought that Ms. Al Jader did not pay Obispo, or did not pay her enough. He did not

8

purport to inform her about the requirements of any of the laws Ms. Al Jader is charged with violating. Indeed, forced labor and document servitude would not become federal crimes until five years after Brown's conversation with Ms. Al Jader. *See* 18 U.S.C. § 1589, effective date October 28, 2000; 18 U.S.C. § 1592, same.

For those reasons, Brown's testimony is incapable of bearing any special relevance. It is inadmissible bad act, character and propensity evidence.

### 2. The Court Should Exclude Evidence Of Alleged Mistreatment of Domestic Employees In 2000

The government intends to call two other witnesses who were formerly employed by Ms. Al Jader in Massachusetts in 2000. The government expects that Veronica Pedroza will testify that Ms. Al Jader brought her to the United States in early 2000, held her passport and the passports of two other Indonesian coworkers and told them that they could not go outside the house alone or they would be arrested and jailed because they had no passports. She will also assert that Ms. Al Jader told her that she would have to repay the money it cost to bring her to the United States if she ceased working for Ms. Al Jader, that she was paid $200 for five months' work, that a son of Ms. Al Jader threatened to beat her and that Ms. Al Jader pointed a finger at her head as if to slap her. Pedroza left Ms. Al Jader's employ soon after arriving in the Untied States and, three years later, reported Ms. Al Jader's treatment of her to an anti slavery group on the west coast.

The court should exclude all of this testimony for all of the reasons set forth above. It is difficult to imagine even the slightest relevance of Pedroza's allegation that one of Ms. Al Jader's children threatened to hit Pedroza. He is not a defendant nor could he be considered a co-conspirator or aider and abettor of Ms. Al Jader's. Unlike the evidence of past treatment of previous employees deemed admissible in *Bradley*, it has

9

no probative value as to Ms. Al Jader's motive in taking the passports of Sophia and Rohimah several years later. The rest of Pedroza's allegations are precisely the type of propensity evidence Rule 404 expressly excludes.

The second witness whom the government will call to testify about events involving previous domestic employees in 2000 is Mukarram Louck. The government intends to offer her testimony that while Ms. Al Jader was away in Saudi Arabia, one of Ms. Al Jader's sons struck a maid and that her and another maid ran away. Louck is also expected to testify that when she informed Ms. Al Jader about the incident, Ms. Al Jader said that it was the maid's fault and she should have done what the child wanted her to do. Louck will further testify that she told Ms. Al Jader that she could not pay low wages and mistreat employees in the United States and that Ms. Al Jader responded that she would just leave if she had to. Finally, the government expects Louck to testify that Ms. Al Jader told her that one of the reasons she kept possession of her employees' passports was because she did not want them to run away. None of these allegations are admissible.

The government's stated purpose for offering Louck's opinions about how to treat employees is the same bankrupt reason for which it offers Brown's testimony described above: to show that Ms. Al Jader was "put on notice of the wrongfulness of her conduct, … ignored the warnings and responded by henceforth locking in a safe the passports of the servants, including Tri and Rohimah's." Government's Local Rule 117(A) disclosure, dated August 15, 2006. Louck's opinions on how to treat household employees in the United States are even less capable of providing "notice" and knowledge than Attorney Brown's pre-litigation posturing on behalf of his client Obispo.

Because the testimony of Louck lacks even the slightest probative value to help establish the stated purpose for offering it, the court should exclude it.

The court should also exclude the allegation that one of Ms. Al Jader's sons slapped a former maid while Ms. Al Jader was thousands of miles away in Saudi Arabia. This allegation is not the least bit probative of forced labor and document servitude involving different maids three to four years later by Ms. Al Jader, not her son or family.

Finally, testimony about Ms. Al Jader's purported reactions to Louck's opinions on how employees should be treated in the United States is precisely the type of "closer to the margin" bad character evidence questioned in *Bradley*. *See* 390 F.3d at 153 ("one might fairly ask why certain portions of the testimony as to [former employees] were relevant-specifically, those parts concerning verbal abuse, the apparent indifference to [their] medical needs, and the circumstances of [their] flight").

## Conclusion

For all of the foregoing reasons, the allegations described above are not relevant and should be excluded under FRE 401 and 402. They are precisely the type of bad character, bad act and propensity evidence expressly excluded under FRE 404 and are not specially probative for any of the purposes identified in that rule. Even if the allegations were the slightest bit probative, they would remain inadmissible under Rule 403 because probativeness is substantially outweighed by the danger of unfair prejudice, confusion of the issues and misleading the jury, or by considerations of undue delay and waste of time.

The court should preclude the government from calling as witnesses at trial Jesse Obispo, Neal Brown, Veronica Pedroza and Mukarram Louck.

>
> HANA AL JADER
> By her attorneys,
>
> /s/ *Joseph J. Balliro*
> Joseph J. Balliro, Sr.
>  B.B.O. #002800
> Balliro & Mondano
> 99 Summer Street, Suite 1800
> Boston, MA 02110
> (617) 737-8442
>
>
> /s/ *E. Peter Parker*
> E. Peter Parker
>  B.B.O. #552720
> 151 Merrimac Street
> Boston, MA  02114
> (617) 742-9099

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 22, 2006.

>                                                  /s/ *E. Peter Parker*
>                                                  E. Peter Parker