IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 05-10085-RCL |
| HANA F. AL JADER | : | |

## UNITED STATES' TRIAL BRIEF

The United States submits this trial brief for the Court's assistance. The brief summarizes the government's anticipated evidence and discusses in some detail the law involving the forced labor and document servitude statutes under which Counts 1-4 are being prosecuted. It then addresses potential evidentiary issues.

### I.    SUMMARY OF ANTICIPATED EVIDENCE

The defendant, Hana F. Al Jader ("Al Jader"), is a Saudi national who has resided with her family in Massachusetts since the early 1990s. She originally came to this area for medical and rehabilitative treatment for her husband, Prince Mohamed Al Saud, who was injured in an automobile accident. At each of her homes in Somerville, Arlington and Winchester, Al Jader repeatedly and successively maintained and exploited the labor of a series of foreign domestic servants by restricting their access to the outside world, confiscating and holding their passports, and paying them meager wages.

The last two of these foreign domestic servants were two Indonesian women, Trimurnyati Bt Sukadi Dzalipa ("Tri") and Rohima Bt Lili Bakri ("Ro"). Pressed by financial hardship and the need

to support their families, both Tri and Ro independently went through employment agencies in Indonesia to work as domestic servants in Saudi Arabia in 2001.  After arriving in Saudi Arabia, Tri and Ro had similar experiences working for different Saudi families.  The work was hard and they were paid the standard rate of 600 rials, or about $150 month.  The "master" always confiscated and held their passports; they were not permitted to leave the house alone; and were told that the police would arrest them if they did venture out without their passports.  Indeed, Tri tried to escape from a particularly harsh master but was caught immediately by her employer.  Instead of being returned to the employment agency, Tri was brought to a police detention center for foreign domestic servants.

Al Jader then took over Tri's employment, hiring her as a cook for the same $150 per month salary.  Around the same time, Ro was transferred to work for Al Jader as a maid.  Like their prior masters, Al Jader confiscated their passports and imposed rules prohibiting unaccompanied departures from the residence.  After a while, Al Jader returned to the United States and left Tri and Ro in Saudi Arabia where they continued working for her sister.  In late 2002, Al Jader needed two more servants in Massachusetts to replace those who had run away from her employment.  Al Jader's sister told Tri and Ro that Al Jader wanted them to come and work for her in the United States and would pay them double their

current salary, or about $300.  They both agreed, although Ro's only other choice was being sent back to Indonesia.

Tri and Ro were taken by an employee of Al Jader and Prince Mohammed to the U.S. Embassy in Riyadh to get non-immigrant B-1 visas to work as personal domestic servants.  As required by State Department regulations, a personal employee contract in English was supplied to the embassy, acknowledging that the employer would pay a monthly salary of $1400, provide room and board and medical expenses, and would not withhold the passport/travel documents of the employee during their stay in the United States.  Both Tri and Ro were orally advised by the embassy official of these terms and told that they should work only eight hours a day.  However, later Al Jader told them that the embassy official was wrong.  Their monthly salary would be only $300 because she would be providing room and board and paying medical expenses.  Al Jader also took their passports.

In February, 2003, Al Jader traveled to the United States with Tri and Ro.  Tri and Rohima were allowed to bring only those belongings which would fit into a single, shared suitcase.  Once they arrived at the residence in Arlington, Al Jader told them that they could never ever leave the house, other than to accompany the children and then only with Al Jader's permission.  If they left the house, the police would catch them because they did not have proper documents with her.  Given their experiences in Saudi Arabia

and complete cultural isolation, both Tri and Ro believed Al Jader.
Later, they learned from Al Jader's children that previous maids
had run away,[1] but they were afraid to try to leave because they
didn't speak any English, had nowhere to go, and had no
identification documents.

Rohima and Tri worked up to 15 hours a day, cooking, cleaning,
serving meals, caring for the severely disabled Prince, and serving
at frequent parties.    Their forays into the world outside the
house were restricted for the most part to accompanied grocery
shopping, family outings where they worked, or pushing the Prince
in his wheelchair for local trips.    They slept on foam mats and
were dependent on Al Jader to supply all of their needs, including
their medical and dental care.    Tri and Ro were paid $300 a month,
or less than 67 cents an hour.[2]  Al Jader often wired this money to
their families in Indonesia at their request.

The visas issued for Tri and Ro in Saudi Arabia were valid for
only six months.    Thus, in July, 2003, Al Jader, through an
attorney, caused applications to be filed with the Bureau of
Citizenship and Immigration Services ("BCIS") for another six-month
extension.    After reviewing the applications, a BCIS examiner
requested a copy of the employment contract between the Prince and

---

[1]Al Jader had told a former employee that she confiscated
the servants' passports to keep them from running away.

[2] This calculation is based upon 15 hours a day/ 7 days a
week/300 a month.

4

the domestic servants, which is standard practice in these types of employment relationships.  In turn, AL Jader's attorney requested a work contract.  Al Jader gave an employee/tutor a handwritten contract to type up on the computer, which he did.  Al Jader had Tri and Ro sign separate copies of the contract, although they could not read its English terms.  Al Jader said that the contracts had to do with being able to work in the United States.  Both Tri and Ro were told by Al Jader to backdate the contracts to January, 2002.

The purported work contracts stated that each servant would be paid $1500 per month, work eight hours daily, and be provided with housing, food, and transportation.  This work contracts, containing these false representations, were then provided to BCIS, resulting in the approval of the visa extensions.

On November 16, 2004, pursuant to a search warrant, FBI and ICE agents conducted a search at Al Jader's homes in Arlington and Winchester.  The warrant affidavit was based in large part on the experiences of a former maid who had been subjected by Al Jader to forced labor in 2000 and the reasonable belief that there were currently Indonesian servants in the same condition at the homes. Tri and Ro were discovered in the Winchester home, and they were grateful for the opportunity to leave with the agents.    T h e agents found in a safe in Al Jader's bedroom passports in the names of Tri and Ro, as well as unused airline tickets to Saudi Arabia.

The agents also seized a ledger of salary payments to Tri and Ro.

## II.  THE INDICTMENT AND LEGAL PRINCIPLES

Counts One and Two charge Al Jader with holding Tri and Rohima in a condition of forced labor in violation of 18 U.S.C. § 1589 and with attempting to do so in violation of 18 U.S.C. 1594(a).  Counts Three and Four charge her with confiscating and holding their passports to restrict their movement in order to hold them in a condition of forced labor in violation of 18 U.S.C. § 1592. Counts Five and Six charge Al Jader with falsifying a work contract in support of the visa extension application submitted to the BCIS, in violation of 18 U.S.C. § 1519.  Counts Seven and Eight charge Al Jader with visa fraud, under 18 U.S.C. § 1546, for submitting a materially false document in support of a visa extensions.  Counts Nine and Ten charge Al Jader with harboring and attempting to harbor the women in violation of 8 U.S.C. § 1324, knowing that they were no longer legally permitted to remain in the United States. Finally, Count Eleven seeks forfeiture, under 18 U.S.C. § 1594, of the homes in which Al Jader held her servants in a condition of forced labor.

### A.  <u>Counts One and Two – Forced Labor and Attempted Forced Labor: 18 U.S.C. §§ 1589 and 1594</u>

Counts One and Two charge Al Jader with forced labor, in violation of 18 U.S.C. § 1589, and attempted forced labor, in violation of § 1594(a).  In pertinent part, § 1589 provides as follows:

> Whoever knowingly provides or obtains the
> labor or services of a person (1) by threats
> of serious harm to, or physical restraint
> against, that person or another person; (2) by
> means of any scheme, plan, or pattern intended
> to cause the person to believe that, if the
> person did not perform such labor or services,
> that person or another person would suffer
> serious harm or physical restraint; or (3) by
> means of the abuse or threatened abuse of law
> or the legal process, shall be [guilty of an
> offense against the United States].

1. **History**

Congress passed § 1589 in 2000 as part of the Victims of Trafficking and Violence Protection Act ("TVPA") in response to the Supreme Court's decision in United States v. Kozminski, 487 U.S. 931 (1988). "In Kozminksi, the Court had interpreted the pre-existing ban on 'involuntary servitude' in § 1584 to prohibit only conduct involving the use or threatened use of *physical* or legal coercion." United States v. Bradley, 390 F,3d 145, 150 (1st Cir. 2004)(emphasis in original). The Supreme Court did not, however, preclude Congress from using the Thirteenth Amendment to proscribe labor compelled by less severe means, and it tacitly invited Congress to do so. Kozminksi, 487 U.S. at 945 ("*In the absence of any contrary indications*, we therefore give effect to congressional intent by construing "involuntary servitude" in a way consistent with the understanding of the Thirteenth Amendment that prevailed at the time of § 1584's enactment") (emphasis added), 951 ("Whether other conditions are so intolerable that they, too, should be deemed to be involuntary is a value judgment that we think is best

7

left for Congress").

In enacting the TVPA, Congress directly responded to Kozminski's invitation by criminalizing a broader range of coercive conduct used to compel labor. See 22 U.S.C. § 7101(b)(13) (noting that Kozminski "narrowly interpreted" involuntary servitude to exclude other coercive conduct with "the same purpose and effect"); see also H.R. Conf. Rep. No. 106-939 at 100-01 (2000), 2000 WL 1479163 (Oct. 5, 2000) ("In order to address issues raised by ... the United States Supreme Court in United States v. Kozminski" proposed legislation "creates a new section 1589"). Thus, it was Congress' express intent to criminalize more subtle methods of coercion which had been used to compel labor, but which Kozminski had excluded from its restrictive definition of involuntary servitude. As the legislative history of § 1589 makes clear:

> Section 1589 is intended to address the increasingly subtle methods of traffickers who place their victims in modern-day slavery, such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence. Because provisions within section 1589 only require a showing of a threat of "serious harm" or of a scheme, plan, or pattern intended to cause a person to believe that such harm would occur, federal prosecutors will not have to demonstrate physical harm or threats of force against victims.

H.R. Conf. Rep. No. 106-939 at 100-01 (2000), 2000 WL 1479163 (Oct. 5, 2000); See also Bradley, 390 F.3d at 150.

Under this section, there is no requirement that a defendant inflict physical harm against a victim or any other person; the

8

harm can be in the form of threats or psychological coercion. Moreover, Congress has defined "serious harm" to include "a broad array of harms, including both physical and nonphysical. . . " Id.

### 2. Elements

To prove a violation of § 1589, the government must establish the following three elements:

(1) the defendant provided or obtained the labor or services of another person;

(2) the defendant used at least one of the following three prohibited means to do so:

    (a) threats of serious harm to or physical restraint against the person or any other person; or

    (b) a scheme, plan or pattern intended to cause the person to believe that non-performance of labor or services would result in serious harm to, or physical restraint against, that person or any other person; or

    (c) the abuse or threatened abuse of law or the legal process; and

(3) the defendant acted knowingly.

### a. First Element

The government must first prove that Al Jader obtained the services of Tri and Ro. The word "obtain," which is readily understandable and used in many criminal statutes, has its ordinary meaning. Smith v. United States, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning"). "Obtain" means to gain,

acquire, or attain.  Webster's Ninth New Collegiate Dictionary (9th ed. 1983).

The government will prove that Al Jader obtained Tri and Ro's labor or services by showing that she requested that the maids be sent to her in the United States and that they did, in fact, enter her service in this country and work for her in her household.  The government will further present evidence that Tri and Rohima worked at least 15 hours a day for the defendant, cleaning the house, washing and  ironing clothes, washing the cars, shoveling snow, and caring for her children.  They also cared for Al Jader's husband, the disabled prince, bathing him, brushing his teeth, and looking after his other needs.  The servants often stayed up late to work at, and clean up after, large parties hosted by the defendant.  At times, the women were able to sleep only three hours a night.

**b.    <u>Second Element</u>**

The government must also prove that Al Jader used at least one of three prohibited means to obtain Tri and/or Ro's labor.  The prohibited means are: (1) threats of serious harm to, or physical restraint against, Tri or Ro or another person; (2) a scheme, plan or pattern intended to Tri or Ro to believe that she or another person would suffer serious harm or physical restraint, if she did not perform labor or services; or (3) the abuse or threatened abuse of law or the legal process.

In <u>Bradley</u>, the First Circuit approved of the following

10

definition of "serious harm" contained in instructions:

> The term "serious harm" includes both physical and non-physical types of harm.  Therefore, a threat of serious harm includes threats of any consequences, whether physical or non-physical, that are sufficient under all the circumstances to compel or coerce a reasonable person in the same situation to provide or continue providing labor or services.

Bradley, 390 F.3d at 150.  The term does not include "permissible warnings of adverse but legitimate consequences."  Id. at 151. Thus, warning an employee of ordinary, negative consequences which attach to her failure to fulfill a work contract do not constitute a threat of serious harm.  For example, a threat to fire an employee whose work is unsatisfactory is clearly a permissible warning of a negative consequence, even though job loss might result in serious harm to the employee.  Confiscating an employee's passport, mentioning violence, and restricting travel are not legitimate warnings of adverse consequences.  Id. at 152.  Creating fear of the American criminal justice system by falsely stating or implying that an employee will be arrested if she leaves the employer's protection is likewise not a permissible warning of a legitimate adverse consequence.  See United States v. Ingalls, 73 F. Supp. 76, 77-78 (S.D. Cal. 1947) (conviction under narrower involuntary servitude statute when servant's labor was compelled, in large measure, by threats to have victim arrested and imprisoned for past adulterous relationship and abortion).

The words "scheme," "plan," and "pattern" are to be given

their ordinary meanings.    Smith v. United States, 508 U.S. at 228. A "scheme, plan, or pattern intended to cause [the alleged victim] to believe that [nonperformance of labor or services will result] in serious harm" need not involve actual threats of serious harm, but may involve any other means – including deception or psychological coercion – used to cause the alleged victim to believe that she, her family, or any other person would suffer serious harm if she refused to continue providing labor or services.    H.R. Conf. Rep. No. 106-939 at 101 (2000), 2000 WL 1479163 (Oct. 5, 2000); 22 U.S.C. § 7101(b) (congressional findings and purposes relating to enactment of § 1589).

The term "abuse or threatened abuse of law or the legal process" means using or threatening to use criminal laws, civil laws, or the legal system to accomplish a purpose for which they were not designed. See RESTATEMENT (SECOND) OF TORTS, § 682 (1977). The term almost inevitably refers to a defendant's use of the legal system to accomplish some form of extortion.    Id. at cmt. b. Threats of arrest or deportation, when done not to report crime or assert a legal right but, instead, to compel a victim to continue working against her will constitutes threatened abuse of the legal process.    See Kozminski, 487 U.S. at 948 ("threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude . . . .").

The government must prove that one of the means set forth

above was sufficient to compel the victim to remain in Al Jader's service.    In making this determination, the jury may consider "known objective conditions, such as youth and immigration status, that make the victim especially vulnerable to pressure.    <u>Bradley</u>, 390 F.3d at 153.    In making the determination whether the victim's will was overborne and her labor unlawfully obtained, the jury may consider Tri and Ro's "special vulnerabilities," including their background, experience, education, socioeconomic status, inequalities vis-a-vis the defendants, etc.    H.R. Conf. Rep. No. 106-939 at 101 (2000), 2000 WL 1479163 (Oct. 5, 2000) (Section 1589's terms and provisions are to be construed with respect to the individual circumstances of victims that are relevant in determining whether a particular type or certain degree of harm or coercion is sufficient to maintain or obtain the victim's labor or services, including the age and background of the victims."). <u>See</u> <u>Kozminski</u>, 487 U.S. at 948-52; <u>United States v. Veerapol</u>, 312 F.3d 1128, 1132 (9th Cir. 2002) (holding in involuntary servitude case that the jury may consider such factors the victim's special vulnerabilities when determining whether the defendant's threats plausibly compelled the victim's service).

A case on all fours with this one is <u>United States v. Alzanki</u>, 54 F.3d 994, 1000-01 (1st Cir. 1995).    In that case, brought under the required standard of § 1584, a Kuwaiti couple living in Massachusetts employed a domestic servant from Sri Lanka who had

previously worked as a domestic worker for the defendants' family in Kuwait. Having experienced "severely restrictive conditions encountered by household servants in Kuwait" and the police practices that enforced them, it was deemed reasonable for the victim to believe and abide by the threats made by the defendants not to venture out from the apartment where she worked for fear of being arrested and put in jail. 54 F.3d at 1004. Noting that "the special vulnerabilities of the victim must be taken into consideration," the court held that a jury instruction directing consideration of the victim's background or experience accurately captured § 1584's objective reasonableness requirement. Id. at 1001-1002.

The fact that Tri or Ro may have initially consented to come to the United States to work for the Al Jader does not mean that they were not victims of force labor. If Tri or Ro willingly began work, but later wanted to withdraw, and was then forced to continue working by one of the three prohibited means, then the statute was violated. See United States v. King, 840 F.2d 1276, 1283 (6th Cir. 1988) ("The Thirteenth Amendment prohibits an individual from selling himself into bondage, and it likewise prohibits a family from selling its child into bondage. The Western legal tradition prohibits contracts consenting in advance to suffer assaults and other criminal wrongs"); United States v. Mussry, 726 F.2d 1448, 1454 n. 6 (9th Cir. 1984) ("Even though a person may come to a job

14

voluntarily, subsequent coerced service constitutes involuntary servitude."), overruled on other grounds, United States v. Kozminski, 487 U.S. 931 (1988); United States v. Bibbs, 564 F.2d 1165 (5th Cir. 1977) (affirming conviction where victims initially agreed to work for defendants); United States v. Shackney, 333 F.2d 475, 484 n. 13 (2d Cir. 1964).

Whether Tri or Ro was paid a salary or a wage is also not determinative of the question of whether she was a victim of forced labor. Bradley, 390 F.3d at 154 (upholding an instruction on lack of payment). Similarly, the fact that Tri or Ro may have had an opportunity to escape is irrelevant if Al Jader, using one or more of three prohibited means discussed earlier, made them reasonably believe that they could not leave. A victim who reasonably believes she cannot leave is under no affirmative duty to try to escape. Bradley, 390 F.3d at 153; Alzanki, 54 F.3d at 1000.

The evidence will show that Al Jader engaged in a scheme, plan, and pattern to force Tri and Ro to believe that they had no choice but to work for the family. Al Jader accomplished this by essentially importing the master-servant relationship from Saudi Arabia. She kept and retained their passports, simultaneously threatening that if Tri and Ro went outside alone, the police would catch them because they had no immigration papers. Al Jader could and did anticipate that the maids would believe this threat, given

their collective experiences in Saudi Arabia.[3]  Al Jader also
restricted them from ever leaving the house unaccompanied by a
family member or associate.  In addition, by threatening that the
victims would be caught by police, Al Jader made threats of serious
harm and threatened to abuse the legal process.

     **c.**   **Third Element**

With regard to the third element of the offense of forced
labor, the government must prove beyond a reasonable doubt that the
defendant acted "knowingly."  A person acts knowingly if he or she
acts intentionally and voluntarily, and not because of ignorance,
mistake, accident or carelessness.  United States v. Tracy, 36 F.3d
187, 195 (1st Cir. 1994); Sand, Modern Federal Jury Instructions,
3A-1.

Here, evidence that Al Jader acted knowingly will include the

---

[3]  As noted above, the First Circuit has recognized that a
victim's experiences with and understanding of police involvement
in forced labor in Middle-Eastern countries are relevant to
determine whether the victim reasonably believed threats made by
the employer in the United States, and such evidence supports the
jury's inference of compelled service.  Alzanki, 54 F.3d at 1004.
Such evidence is even more compelling in this case, where Tri was
actually arrested and jailed for trying to escape an employer.
Compare Alzanki, where the victim merely heard of people being
arrested in Kuwait.  Id.  The First Circuit has recognized that a
victim's experiences with and understanding of police involvement
in forced labor in Middle-Eastern countries are relevant to
determine whether the victim reasonably believed threats made by
the employer in the United States, and such evidence supports the
jury's inference of compelled service.  Alzanki, 54 F.3d at 1004.
Such evidence is even more compelling in this case, where Tri was
actually arrested and jailed for trying to escape an employer.
Compare Alzanki, where the victim merely heard of people being
arrested in Kuwait.  Id.

fact that she was told on more than one occasion, during her
employment of previous foreign domestic servants in Massachusetts,
that she could not mistreat her employees in the United States by
restricting their movements, holding their passports, and paying
them meager salaries.  Al Jader's response was to say that she
would just leave if ever her practices were made known to the
authorities.  Moreover, her fabrication and submission of false
work contracts show her consciousness of wrongdoing.

    **3.**   **Non-Defenses to Forced Labor**

It is not a defense to a charge of forced labor that a
defendant was freely exercising religious beliefs, or that her
actions were taken in conformity with her own cultural or moral
code, or that her actions would not be illegal in the country of
her origin.  Foreign cultures or *bona fide* religious beliefs do not
absolve a defendant of liability under the criminal law.
Employment Division, Dept. Of Human Resources of Oregon, Inc. v.
Smith, 494 U.S. 872, 877-81 (1990) (discussing cases); Chatwin v.
United States, 326 U.S. 455, 460 (1946); Prince v. Massachusetts,
321 U.S. 158, 167, 170 (1944); Cantwell v. Connecticut, 310 U.S.
296, 310 (1940); Reynolds v. United States, 98 U.S. 145 (1878);
United States v. Cain, 653 F.2d 883-84 (4th Cir. 1991); United
States v. Lewis, 644 F. Supp. 1391, 1395 (W.D. Mich. 1986), aff'd
sub nom United States v. King, 840 F.2d 1276, 1283 (6th Cir. 1988).

Counts One and Two charge Al Jader not only with the completed

forced labor offense but also with attempted forced labor. To prove that Al Jader is guilty of attempted forced labor, the government must prove that she intended to commit the substantive offense and took a substantial step towards its commission. See United States v. Doyon, 194 F.3d 207, 210 (1st Cir. 1999) ("we have viewed the two key elements of the offense of attempt as (1) an "intent" to commit the substantive offense and (2) a "substantial step towards [its] commission.").

**B.    Counts Three and Four: 18 U.S.C. § 1592 Document Servitude**

Counts Three and Four of the indictment charge Al Jader with violating § 1592 by confiscating and holding Tri and Rohima's passports and other documents to keep them from running away. Sectoin 1592 criminalizes the destruction or withholding of a victim's immigration documents for the purpose of unlawfully maintaining the victim's labor or services. Section 1592 provides in pertinent part:

> (a) Whoever knowingly destroys, conceals, removes, confiscates, or possesses any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person –
>
> (1) in the course of a violation of section . . . 1589;
>
> (2) with intent to violate section . . . 1589; or
>
> (3) to prevent or restrict or to attempt to prevent or restrict, without lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons, as defined in section 103 of the Trafficking Victims

18

Protections Act of 2000,

shall be [guilty of an offense].

**1.    <u>Elements</u>**

In order to prove a violation of § 1592 in this case, the government must prove each of the following elements:

(1)    the defendant concealed, removed, confiscated or possessed an actual or purported passport, immigration document, or other government identification document of another person – here, Tri and/or Ro

(2)    the concealment, removal, confiscation or possession of the document either

(a) occurred in the course of a violation of Title 18, United States Code, Section 1589, which prohibits forced labor;

(b) was done with the intent to violate Section 1589; or

(c) was done (1)to restrict their movement, 2)to compel their labor, and 3)that the victims are persons who are "victims of a severe form of trafficking."

To prove that someone was a victim of a severe form of trafficking, one must show that they were subjected to "recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery." TVPA 103(8).[4]

---

[4]"Involuntary servitude" for this purpose is not the § 1584 standard, but the § 1589 standard: a condition of servitude

(3)  the defendant acted knowingly.

The evidence will establish that Al Jader's confiscation of the passports (which were found in a locked safe unavailable to the victims) had this three-fold purpose.  Significantly, Al Jader not only took their passports but also threatened that they would be arrested if they left the house without the very documents she had taken from them.

**C.  Counts Five and Six : 18 U.S.C. § 1519, False Records**

Counts Five and Six of the indictment charge Al Jader with violations of § 1519 for having produced and submitted false statements in support of the visa extensions for Tri and Rohima. 18 U.S.C. § 1519 is a relatively new [2002] obstruction statute which reads:

> Whoever knowingly . . . falsifies. . . any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

The elements of a violation of § 1519 are:

(1)  That the defendant falsified, or caused another to falsify, a  document;

---

induced by means of any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or through the abuse or threatened abuse of the legal process. TVPA 103(5).

(2)  That the defendant did so, knowing that it was false;

(3)  That the defendant did so intending to impede, obstruct or influence the proper administration of a matter within the jurisdiction of the Bureau of Citizenship and Immigration Services, Department of Homeland Security.

The jury may find Al Jader guilty even if they do not find that she personally falsified the document, if they find that she willfully caused another to do so.  See 18 U.S.C. § 2(b); Pereira v. United States, 347 U.S. 1, 8 (1954) (interpreting § 2(b) and holding "to constitute a violation of these provisions, it is not necessary to show that petitioners actually mailed or transported anything themselves; it is sufficient if they caused it to be done").

### D.  Counts Seven and Eight: 18 U.S.C. § 1546(a), Visa Fraud

Counts Seven and Eight charge Al Jader with Visa Fraud in connection with the applications to the BCIS for visa extensions for Tri and Ro.  18 U.S.C. § 1546 states in relevant part:

> Whoever knowingly makes under oath. . . any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, *or knowingly presents any such application*, affidavit or other document containing any such false statement shall be imprisoned not more than five years.

18 U.S.C. § 1546(a)(emphasis added).

The statute proscribes two different courses of conduct concerning visa applications: (1) knowingly making a false

21

statement under oath, and (2) knowingly presenting a false statement. United States v. Khalje, 658 F.2d 90, 91 (2d Cir. 1981). It is not necessary that the false statement contained in the document be made under oath. Id. at 92. By submitting a document which contained a material false statements in support of a visa application, Al Jader violated the statute. See e.g., United States v. Matsumara, 244 F.3d 1092, 1104 (9th Cir. 2001).

Documents which fall under the reach of § 1546(a) include more than just official immigration document. They include any documents prescribed for entry by any statute or regulation. United States v. Ryan-Webster, 353 F.3d 353, 361-63 (4th Cir. 2003). A false statement is made "knowingly" if [defendant] knew that it was false or demonstrated a reckless disregard for the truth with a conscious purpose to avoid learning the truth. First Circuit Pattern Jury Instructions (Criminal) § 4.15 (1998); see also United States v. Polar, 369 F.3d 1248 (11th Cir. 2004) (holding that "knowingly" for the purposes of § 1546 does not entitle the defendant to a "willfully" instruction).

The statement is "material" if it has a natural tendency to influence or to be capable of influencing the decision of the decision maker to which it was addressed. First Circuit Pattern Jury Instructions (Criminal) § 4.15 (1998); see also United States v. Kone, 307 F.3d 430, 435-36 (6th Cir. 2002).

For the reasons explained above, the government need not prove that Al Jader personally submitted materially false documents. It may obtain a conviction if it proves that she caused another to do so. See 18 U.S.C. § 2(b).

### E.    Counts Nine and Ten: 8 U.S.C. § 1324(a)(1)(A)(iii) Alien Harboring

Counts Nine and Ten charge Al Jader with harboring Tri and Rohima in her home as illegal aliens after their visa had expired, in order to keep them working for her as she tried to line up other servants. 8 U.S.C. § 1324(a)(1)(A)(iii) states:

> (1)(A) Any person who
>
>> (iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor or shield from detection such alien in any place, including any building or any means of transportation.

If the conduct was done "for purpose of commercial advantage or private financial gain," the maximum punishment goes from five to ten years imprisonment. 8 U.S.C. § 1324(a)(1)(B)(I).

To prove a violation of the statue, the government must prove that (1) Tri, in Count 9, and Ro, in count 10, are aliens who have remained in the United States in violation of law; (2) the defendant harbored the aliens; (3) the defendant knew, or acted in reckless disregard of the fact, that the alien remained in the United States in violation of law; (4) the defendant acted

23

willfully in furtherance of the alien's illegal presence in the
United States; and (5)the defendant acted for the purpose of
commercial advantage or private financial gain. See United States
v. Guerra-Garcia, 336 F.3d 19, 23 (1st Cir. 2003) (setting forth
elements of analogous transportation section of 8 U.S.C. §
1324(a)(1)(A)).

Courts always have construed the harboring provision of § 1324
liberally.  Because the terms "conceals, harbors, or shields from
detection," are set forth in the disjunctive, the Government may
prove any one of them.  United States v. Rubio-Gonzalez, 674 F.2d
1067 (5th Cir. 1992).  Moreover, the activity need not be part of
a smuggling operation; harboring has been defined as any conduct
tending to substantially facilitate an alien's remaining in the
United States illegally. Id at 1073.

Allowing an alien to live in one's home, especially if done
for financial gain, constitutes harboring, see United States v.
Acosta de Evans, 531 F.2d 428, 430 (9th Cir. 1976)(defining
harboring as "to afford shelter to," in upholding conviction of
defendant who allowed several illegal aliens to live with him), and
the government need not prove that the defendant acted with the
intent to help the alien evade immigration authorities.  United
States v. Aguilar, 871 F.2d 1436 (9th Cir. 1989).  Prior decisions
which required secrecy or clandestine behavior, have long been
invalidated by amendments to § 1324. See United States v. Lopez,

24

521 F.2d 437 (2d Cir. 1975) (noting amendments and holding provision of shelter constitutes violation).

The Government can satisfy the mental state requirement through proof of "reckless disregard" of alienage and unlawful status or unlawful entry. See United States v. Ramirez-Jiminez, 967 F.2d 1321, 1328 (9th Cir. 1992) (upholding conviction because evidence showed defendant knew, "or at least acted in reckless disregard" of illegal alienage). In the First Circuit, reckless disregard has been construed as knowing that "it is very likely" that the alien was in the United States illegally. Guerra-Garcia, 336 F.3d at, 25-26 (approving willful blindness instruction in transporting illegal alien case).

There is little case law defining the term "for private financial gain," but it has been successfully found by a jury in a domestic servant case, United States v. Bonetti, 277 F.3d 441, 445 (4th Cir. 2002). This finding comports with courts that have construed the phrase fairly broadly. See e.g., United States v. Zheng, 306 F.3d 1080, 1096 (11th Cir. 2002)(applied to restaurant owner who let illegal aliens live in his house; rejects argument that only applies to smuggling operations; defendants gained financially by paying lower wages and not paying Social security); United States v. Kim, 193 F.3d 567, 577 (2d Cir. 1999)(in upholding sentencing factor, noting that in providing aliens housing and employment, defendant did not act "out of any feelings of charity

or affection"). Here, Al Jader clearly benefitted financially by her harboring of Tri and Ro whom she paid below the prevailing wage.

**F.  Forfeiture Counts**

In this criminal action, the United States seeks forfeiture of the following real properties:

> (a)  339 Mystic Street, Arlington, Massachusetts, more specifically described in the deed recorded on September 26, 2003, in the South Middlesex County registry of deeds, book 41030, page 479 ("339 Mystic Street"); and

> (b)  62 Cambridge Street, Winchester, Massachusetts, more specifically described in the deed recorded on July 13, 2001, in the South Middlesex County registry of deeds, book 33250, page 379 ("62 Cambridge Street"),

(collectively, the "Real Properties") on the grounds that they were used or intended to be used to commit or to facilitate the commission of the violations of 18 U.S.C. §§ 1589 and 1594 charged in Counts One and Two of the Indictment. The applicable statute provides that the Court, in imposing sentence on a person convicted of a violation of 18 U.S.C. § 1589 or 1594, shall order that person to forfeit to the United States "such person's interest in any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of such violation". 18 U.S.C. § 1594(d).

The United States also seeks forfeiture of the Real Properties on the grounds that they were used to facilitate, or were intended

26

to be used to facilitate, the violations of 18 U.S.C. § 1324(a) alleged in Counts Nine and Ten of the Indictment.  The applicable statute provides that the Court, in imposing sentence on a person convicted of a violation of, or conspiracy to violate, 18 U.S.C. § 1324(a), shall order that person to forfeit to the United States "any property real or personal ... that is used to facilitate, or is intended to be used to facilitate, the commission of the offense of which the person is convicted."  18 U.S.C. § 982(a)(6)(A)(ii).

Pursuant to Fed. R. Crim. P. 32.2(b), the criminal trial must be bifurcated into guilt and forfeiture phases.  The court must conduct a proceeding to determine the forfeitability of the Real Properties as soon as practicable after the court enters a guilty verdict.  Fed. R. Crim. P. 32.2(b)(1).  Generally, the forfeitability of property is determined by the court, but in cases where the guilty verdict was returned by a jury, the defendant has the right to ask that the jury be retained to make the forfeitability determination.  Fed. R. Crim. P. 32.2(b)(4); <u>United States v. Davis</u>, 177 F. Supp. 2d 470 (E.D. Va. 2001) (under Rule 32.2(b)(4), defendant must make a specific request to have the jury retained to determine the forfeiture).

The burden of proof regarding forfeitability of property in a criminal case is preponderance of the evidence.  <u>Libretti v. United States</u>, 516 U.S. 29, 49 (1995) (forfeiture is part of the sentencing phase of a criminal case, and a defendant accordingly

has no Sixth Amendment right to have the jury determine the forfeitability of his property); United States v. Rogers, 102 F.3d 641, 648 (1st Cir. 1996) (burden of proof in § 853 cases is preponderance of the evidence because criminal forfeiture is part of the sentence under Libretti); United States v. Keene, 341 F.3d 78, (1st Cir. 2003) (Apprendi v. New Jersey, 530 U.S. 466 (2000) does not apply to the forfeiture phase of a criminal trial); United States v. Heldeman, 402 F.3d 220 (1st Cir. 2005) (remanding for resentencing in light of United States v. Booker, 125 S.Ct. 738 (2005), but affirming forfeiture). The forfeiture is not viewed as a separate charge, but as an aspect of punishment imposed following conviction of a substantive offense. Keene, 341 F.3d at 85-86 (internal quotations and citations omitted).

The court, or the jury at the defendant's request, must find whether there is a nexus between the property that the government asserts shall be forfeited to the United States and each violation of which it finds the defendant guilty. The finder of fact may consider any evidence, including testimony, offered by the parties at any time during the trial. The finder of fact must not consider what happens to any property that is declared forfeited, nor should it consider any claims that other persons may have to the property. The interests that other persons may have in the property will be taken into account by the court at a later time. Similarly, any claims that the forfeiture of the property would constitute

28

excessive punishment will be taken into account by the court at a later time.

### III. EVIDENTIARY ISSUES

In the present case, members of the Al Jader household staff -- drivers, house managers, and others -- made statements to the victims and to visa adjudicators in the course of their employment and within the scope of their assigned duties. These are properly admitted under Rule 801(d)(2)(D).

A statement is a nonhearsay party admission under Rule 801(d)(2)(D) if (1) an agency relationship existed; (2) the statements were made during the course of the relationship; and (3) the statements relate to matters within the scope of the agency. Gomez v. Rivera Rodriquez, 344 F.3d 103 (1st Cir. 2003). In determining whether an agency or employment relationship existed at the time of the statement, and in determining the scope of such relationship, the contents of the statement may be considered but are not alone sufficient. Id.

Whether the matter is within the scope of the agency or employment is governed by the employee's normal duties or what the employee has been ordered to do; there is no requirement that the employer specifically authorize each statement for them to be admissible in this fashion. Larch v. Mansfield Mun. Elec. Dep't, 272 F.3d 63, 72 (1st Cir. 2001)(while declarant's duties did not

29

authorize him to make life miserable for certain workers, oversight of their office was within his power: resulting statements were therefore admissible as having been made within scope of his agency).

                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney


                         By: /s/ S. Theodore Merritt
                              S. THEODORE MERRITT
                              Assistant U.S. Attorney


                              BARBARA KAY BOSSERMAN
                              Trial Attorney
                              Criminal Section
                              Civil Rights Division
                              U.S. Department of Justice


### CERTIFICATE OF SERVICE

    I, S. Theodore Merritt, Assistant United States Attorney, do hereby certify that this document, filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non registered participants on this date.


                              /s/ S. Theodore Merritt
                              S. THEODORE MERRITT
                              Assistant U.S. Attorney